Darryl D. CRUTCHFIELD, Appellant,

v.

UNITED STATES, Appellee.

No. 98–CF–1135.

District of Columbia Court of Appeals.

Argued Dec. 13, 2000.
Decided Aug. 23, 2001.

Kenneth H. Rosenau, Washington, DC, appointed by the court, for appellant.

Jonathan M. Malis, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, Kevin Flynn, and DeMaurice Smith, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and WASHINGTON, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

This is an appeal from convictions of all twenty-seven counts of an indictment arising from a drug-related triple murder and a subsequent murder of a potential prosecution witness.[1] Appellant Darryl D.

---

1. The counts and sentences are as follows:
 - One of conspiracy to commit first degree burglary and armed robbery, D.C.Code § 22–105a (1996), twenty months to five years to run concurrently with all other counts;
 - Two of first degree burglary while armed, D.C.Code §§ 22–1801(a), –3202 (1996), fifteen years to life on each count to run concurrently with all other counts;
 - Five of possession of a firearm while committing a crime of violence or a dangerous offense, D.C.Code § 22–3204(b) (1996), five to fifteen years on each count to run concurrently with all other counts;
 - Two of armed robbery, D.C.Code §§ 22–2901, –3202 (1996), fifteen years to life on the first count to run concurrently with all other counts, and fifteen years to life on the second count to run consecutively;
 - Three of first degree murder while armed (premeditated), D.C.Code §§ 22–2401, –3202 (1996), thirty years to life on each count to run consecutively;
 - Six of first degree murder while armed (felony murder), D.C.Code §§ 22–2401, –3202 (1996), thirty years to life on each count to run concurrently with all other counts;

Crutchfield raises twenty-six issues.[2] Some amount to attacks on all convictions—challenges to the trial court's admission of out-of-court statements made by appellant's girlfriend before he slew her, limitations on cross-examination of a government witness, and three aspects of the prosecution's closing argument. Others challenge specific convictions on various grounds—most notably the obstruction of justice and burglary charges. After a factual overview, we first address those arguments aimed at all convictions. Then, we focus on those arguments targeting specific convictions. Finding no error warranting reversal of any conviction, we affirm.

## Factual Overview[3]

### A. The Triple Murder

The killings of Edwin Knight, his brother Emory Knight, and Russell Jackson arose out of a debt of money and crack cocaine that appellant claimed was owed to him by victim Edwin Knight. On the day of the triple murder, December 18, 1996, appellant, Ms. Jamyra Simpson, and Ms. Takiesha[4] Wiseman went to the Knights' home in a gold or "champagne color" Nissan Maxima belonging to appellant's mother. Appellant told the two women of the debt and said "no one would get hurt if [Simpson] just did what he asked [her] to do." Appellant told Simpson to go inside and ask Edwin to come outside. Simpson was frightened, but went to the house as appellant and Wiseman drove off and parked the car down the block. Appellant left Wiseman in the car and proceeded back to the Knights' house.

Rather than bringing him outside to meet with appellant, Simpson left with Ed-

---

- One of possession of a prohibited weapon, D.C.Code § 22–3214(a) (1996), one year to run concurrently with all other counts;
- One of unlawful possession of a pistol, D.C.Code § 22–3203(a)(2) (1996), one year to run concurrently with all other counts;
- One of carrying a pistol without a license, D.C.Code § 22–3204(a) (1996), twenty months to five years to run concurrently with all other counts;
- Two of possession of an unregistered firearm, D.C.Code § 6–2311(a) (1995), one year on the first count to run concurrently with all other counts, and one year on the second count to run consecutively;
- Two of unlawful possession of ammunition, D.C.Code § 6–2361 (1995), one year on each count to run concurrently with all other counts; and
- One of obstruction of justice, D.C.Code § 22–722(a)(2) (1996), fifteen years to life to run consecutively.

2. Given the number of issues raised in this appeal, counsel's attention is invited to Chief Justice Burger's opinion in *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one cen-

tral issue if possible, or at most on a few key issues." *Id.* When asked at oral argument what were his strongest points of contention, appellant's counsel pointed to the perceived abuses in the prosecution's closing argument, and the asserted lack of evidence that Takiesha Wiseman qualified as a witness within the meaning of the obstruction statute and under *Devonshire v. United States*, 691 A.2d 165 (D.C.1997) (holding that defendant who procures the unavailability of a witness waives his right to object to admission of that witness' out-of-court statements). We have endeavored to prevent obscuring the stronger issues by our treatment of the lesser ones. Hence the otherwise regrettable length of this opinion. Any issues arguably not considered directly are deemed not to warrant such treatment and certainly not, on the record on appeal, to warrant reversal of any or all convictions.

3. Additional facts necessary to address particular issues will be highlighted in the applicable portions of the opinion.

4. Ms. Wiseman's first name is also spelled "Takisha" in some parts of the record. In those instances, we have retained the spelling of the original documents.

win Knight to go to a restaurant, but they returned to the house a short time later because he had forgotten his wallet. While the two were in front of the house, appellant appeared with a Tech 9 machine gun in his hand. He ordered the two into the house. Once inside, appellant asked if anyone else was there. Edwin Knight revealed that his brother, Emory Knight, was also present. Appellant and Edwin Knight went upstairs leaving Simpson on the first floor. When they returned, Emory Knight was with them. No words were spoken by them. All four then went into the first floor bedroom. The two brothers sat on the bed and Simpson stood in the doorway. Appellant asked "where was his shit" and Edwin Knight replied that he did not "have it all right now." Appellant directed Edwin Knight to open a safe near the bed. When he did, it appeared to contain crack cocaine, marijuana, and money. When the items were handed to appellant, he exclaimed, "That's not all my shit, I know you got more."

About that time Russell Jackson knocked on the front door. Appellant ordered him into the bedroom at gun point, and then ordered the three men onto the bed and directed them to stack themselves three high. As appellant stood in front of the bed, Simpson backed away and began praying. Appellant "began to shoot everybody" on the bed. Simpson, after witnessing these events, ran from the house, caught a cab and went home. As she fled down the street, she saw the Nissan parked at a nearby corner.

The shooting was heard by Malik Hopkins who was visiting a neighbor who lived on Knight's block. Hopkins then heard some one running very fast down the street and a car door slam. He went to a window and saw a gold Nissan Maxima back up quickly and then "zoom" away.

Meanwhile Edwin Knight, though shot, called the police. Upon their arrival, officers noted that he appeared "lost" as he sat on the bed. Asked who had shot him, Edwin Knight whispered, "Myra," gave police a telephone number, and pointed to an address book containing Jamyra Simpson's whispered telephone number. While being questioned later in his hospital bed, Edwin Knight told police officers that a man was with Simpson during the shooting.

Many bullets, fragments and shell casings were recovered from the bed area. Emory Knight and Jackson died of their wounds soon after being shot. Edwin Knight died some weeks later in the hospital. Bullets and fragments were recovered from the bodies of Jackson and Emory. The casings and bullets were matched to a machine gun that was subsequently recovered from among appellant's possessions. Bullets matching the murder weapon were also found in Edwin's hospital bed as he lay unconscious, apparently having worked their way out of his wounds.

The day after the shooting Wiseman called Simpson and told her that after appellant left the Knights' house and returned to the car he said "that was his high, that's how he gets off, on blowing his clip on niggers [sic]." The next day appellant and Wiseman appeared uninvited at Simpson's home. There appellant told Simpson, that "he didn't mean for it to happen like that and ... as long as [Simpson did not] talk to [the] police everything [was] going to be okay." In referring to a news account that Edwin had survived the shooting, appellant said, "he was going to get whoever it was [who] didn't die."

Three days after the shooting, appellant and Wiseman went unannounced to Simpson's mother's house. Appellant's expressed purpose was to take Simpson to

"where he hung [out] at and where his mother live[d] so that [Simpson] had no reason to be scared of him." The three drove off. At one point, appellant stopped, got out of the car, and spoke with someone who went into a house and returned with the gun that appellant had used on December 18.

Ms. Simpson was arrested on December 28, by Maryland police and subsequently charged in the District of Columbia with the three murders. Upon her arrest, she first denied knowing of the three murders, but then gave an incomplete written account of them to both Maryland police and FBI agents. Simpson entered into a plea agreement and pleaded guilty to conspiracy to commit burglary, and the murder charges were dismissed. As a government witness, she acknowledged on cross-examination the foregoing plea. On redirect examination, she explained that she had told Maryland police of appellant's involvement in the murders prior to making the plea agreement.

### B. The Murder–Based Obstruction Count

After appellant shot the three men, he ran to the gold Nissan Maxima in which Wiseman had been waiting and made the inculpatory statement to her about "blowing his clip." Sharon Foxworth, a friend of Wiseman, noticed that soon after the murder she was "quiet, drawn to herself ... with a worried look on her face." Foxworth also testified that Wiseman said "me and my friend killed somebody" but then tried to appear to be joking. After Simpson's transfer to the custody of the District of Columbia, Simpson called Wiseman and told her that she should speak to a Detective Bell. Wiseman seemed scared and replied, "what [was she] talking about."

According to Foxworth, Wiseman seemed particularly tense and scared from December 28, 1996 to January 8, 1997. During one conversation Wiseman told Foxworth she was "on vacation;" when asked if she was with appellant, she replied, "me and my Boo, we're okay." Upon being told that Detective Bell was looking for her, Wiseman replied, "whatever anybody tell[s you] about [me], [I] didn't do anything." In a January 8, 1997 conversation, Wiseman told Foxworth that she was coming home to get her daughter for a "court date," but she never did so. Two days later, Wiseman called a relative who worked at the Superior Court to inquire as to "what was going on with the case of Jamyra."

During December, appellant resided primarily at his mother's home near the Maryland border and the Eastover Shopping Center. When appellant's mother told him that the police were looking for him and had searched the house, appellant left the home.

On January 11, 1997, the badly burned body of Takiesha Wiseman was found in a large field near the Eastover, Maryland shopping center. She had been shot twice in the back of the head at very short range. Two .380 bullets and cartridge casings were recovered from and around the body. Despite the burning, the body was identified by the medical examiner by fingerprints and a photograph.

Appellant slept at the home of a friend, Diana Hewitt, shortly after leaving his mother's home. When Hewitt asked why he was staying with her, appellant responded, "whatever [you] don't know won't hurt [you]." On February 4, appellant was arrested at Hewitt's home. Since the triple murder, he had stopped shaving his head, and had grown facial hair. The machine gun used in the triple murder and

the .380 caliber gun used to kill Wiseman were recovered among other belongings of appellant during a search of Hewitt's home at the time of appellant's arrest.

## Analysis

*Table of Contents*

A. Restriction of Cross–Examination of Simpson ................................. [316]
B. Prosecution's Closing Argument ........................................... [318]
C. Joinder and Severance ..................................................... [321]
D. Wiseman as a Prosecution Witness Under D.C.Code § 22–722(a) ............... [325]
E. Official Proceeding Under D.C.Code § 22–722(a) ............................ [327]
F. Admission of Wiseman's Out–of–Court Statements Under Devonshire v. United
 States ................................................................ [328]
G. Obstruction Count Jury Instructions and Burden of Proof ...................... [332]
H. Vicinage and Subject Matter Jurisdiction ..................................... [333]
I. Constructive Amendment of Indictment ....................................... [334]
J. Sufficiency of the Evidence Supporting Burglary Count ......................... [335]

Conclusion ...................................................................... [335]

### A. Restriction of Cross–Examination of Simpson

Appellant argues that the trial court abused its discretion when "it restricted the defense cross-examination of Jamyra Simpson." Specifically, appellant complains that the trial court improperly prevented cross-examination on the following subjects: (1) alleged prior armed robberies of drug dealers by Simpson; (2) Simpson's prior dealings with a police officer and the bias that might have resulted from the officer's presence at the scene of the triple murder; (3) alleged cellular telephone conversations between Simpson and appellant; and (4) Simpson's alleged registration of a car in the days after the triple murder.

■ As appellant acknowledges, the trial court has considerable discretion to impose reasonable limits on cross-examination. *See Scull v. United States,* 564 A.2d 1161, 1164 (D.C.1989); *cf. Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (right to cross-examine is not without limits). "[T]he trial court may in its discretion limit cross-examination 'into matters having little relevance or probative value to the issues raised at trial.'" *Payne v. United States,*

516 A.2d 484, 498 (D.C.1986) (quoting *Springer v. United States,* 388 A.2d 846, 855 (D.C.1978)). In reviewing the trial court's determinations for abuse of discretion, we consider whether meaningful cross-examination was precluded by the trial court's rulings. *See Flores v. United States,* 698 A.2d 474, 479 (D.C.1997).

Because our review of the record reveals that none of the trial court's restrictions precluded meaningful cross-examination, we conclude that the trial court did not err. We deal with each of appellant's contentions below.

#### 1. Simpson's Prior Uncharged Robberies of Drug Dealers

■ In *Newman v. United States,* relied on by appellant, we held that the defense could question a witness about a crime committed by that witness which bore similarity to the charge against the defendant both to show the witness's motive to lie and to imply that the witness might have actually committed the charged offense. *Newman v. United States,* 705 A.2d 246, 254–57 (D.C.1997) (relying on *Winfield v. United States,* 676 A.2d 1 (D.C.1996) (en banc), and its explication of the relevance of "reverse-*Drew*" evidence, *Drew v. Unit-*

*ed States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964)). However, *Newman* turned on a number of similarities between the crimes, including a similar *modus operandi,* similar treatment of victims, a very short time—two weeks—between the two criminal events, and proffered testimony that affirmatively indicated that the defendant was not at the scene of the charged crime. *See* 705 A.2d at 256–57. The record before us reflects that the prior robberies in which Simpson was allegedly implicated had occurred more than three years before the triple murder. Moreover, beyond the fact that the victims were believed to be drug dealers, defense counsel proffered no similarities between those earlier robberies and the triple homicide. Because appellant's proffer was comprised of nothing beyond prior bad acts highly attenuated from his charged offenses, the trial court did not err in excluding the proposed cross-examination.

## 2. *Simpson's Prior Dealings with Police*

■ Appellant also sought to cross-examine Simpson for bias stemming from her arrest earlier in 1996 on charges related to gun possession. Those charges were eventually dropped after a police officer amended the charges on a police report, thus creating confusion as to the proper charges. Appellant alleges that, because the same officer was on the scene of the triple murder when Edwin Knight gave the police Simpson's name, Simpson may have falsified testimony in return for continued favorable treatment in the triple murder investigation. The trial court ruled that, because appellant had failed to proffer any evidence of any ongoing relationship between Simpson and the officer or of how she might have benefitted from her earlier contact with him, no bias had been shown and the proposed cross-examination should not be permitted.

■ "[A] trial court does not abuse its discretion by precluding cross-examination where the connection between the facts cited by defense counsel and the proposed line of questioning [is] too speculative to support the questions." *McGriff v. United States,* 705 A.2d 282, 285 (D.C.1997) (internal quotations omitted). Our review of defense counsel's proffer confirms that any suggestion of Simpson's bias on this point was unsupported speculation. Therefore, we conclude that the trial court acted without error in preventing this line of questioning.

## 3. *Simpson's Cellular Telephone Conversations with Appellant*

■ Appellant argues that the trial court abused its discretion by foreclosing defense counsel's cross-examination of Simpson as to the conversations that she may have had with appellant on his cellular telephone. Upon the government's objection, the trial court ruled that the questions were outside the scope of direct examination.

Because the direct examination of Simpson had not gone into her communication with appellant via his cellular telephone, the trial court did not err in limiting the scope of cross-examination to those areas actually covered by the direct examination. *See Guzman v. United States,* 769 A.2d 785, 790 (D.C.2001); *Chambers v. United States,* 564 A.2d 26, 30 (D.C.1989), *overruled in part on other grounds by Berroa v. United States,* 763 A.2d 93, 96 & n. 6 (D.C.2000). Further, we note that defense counsel's stated goal of this line of questioning was to establish "how frequently [Simpson] talked to [appellant]," and that the trial court explicitly permitted the defense to cross-examine Simpson about the frequency of her communications with appellant.

*4. Prohibition of Impeachment of Simpson via Motor Vehicle Registration*

On cross-examination, Simpson denied ever owning or registering a blue Chevrolet automobile. Defense counsel attempted to impeach Simpson by introducing into evidence a Department of Motor Vehicle (DMV) registration document in her name which had been registered on the day after the triple murder. After hearing testimony from a DMV investigator, the trial court sustained the prosecution's objection on the ground that DMV procedures would have permitted another person to register the car under Simpson's name.

Determinations of relevance are committed to the sound discretion of the trial court. *See Dockery v. United States,* 746 A.2d 303, 307 (D.C.2000). Even taking as valid appellant's contention that it would be relevant if Simpson registered a car the day after the triple murder and lied about it on the stand, the fact that the registration document could have been executed by anyone provides a valid basis for excluding such evidence. Therefore, the trial court did not abuse its discretion in preventing admission of the automobile registration form for impeachment purposes.

*B. Prosecution's Closing Argument*

Appellant attacks three aspects of the prosecution's closing argument at trial: (a) appeals to jurors' sympathy and to send a message; (b) references to jurors' civic duty; and (c) interjections of prosecutor's personal opinion, all of which are discussed in more detail below. With the exception of one instance, *see infra* Part B.5, defense counsel failed to object to the purported improprieties. Therefore, we may only consider whether the prosecution's alleged missteps amounted to plain error affecting substantial rights. *See Brown v. United States,* 766 A.2d 530, 541–42 (D.C.2001). "In determining whether there was plain error, we consider 'whether the judge compromised the fundamental fairness of the trial, and permitted a clear miscarriage of justice, by not intervening, *sua sponte,* when the prosecutor made [the challenged] remarks....'" *Reyes v. United States,* 758 A.2d 35, 39–40 (D.C.2000) (citing *McGriff, supra,* 705 A.2d at 288); *see also McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) ("When there has been no objection at trial, reversal of a conviction based on improper prosecutorial argument is appropriate only in a 'particularly egregious' case." (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985))). Thus, appellant's burden here is a heavy one which will only be borne under extreme circumstances.

Based on the more detailed analysis that follows, *see infra* Part B.4, we conclude that, given the considerable strength of the evidence against appellant, the judge's instructions to the jury, and the relative mildness and ambiguity of the prosecutor's challenged statements, even in the aggregate those statements did not bring about a "miscarriage of justice." *McGrier, supra,* 597 A.2d at 41.

*1. Appeals to Jurors' Sympathy and to Send a Message*

We have held that closing argument may "not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response ... rather than the logical analysis of the evidence in light of the applicable law." *Bertolotti v. State,* 476 So.2d 130, 134 (Fla.1985), *quoted in Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989). This is not such a case. We therefore hold that the following excerpts, most heavily em-

phasized by appellant, did not require the trial court to intervene in order to avoid plain error:

- The prosecutor stated that the jurors were "blessedly not personally connected with the events," referring to the triple murder and Wiseman's slaying.

- In discussing Wiseman's death, the prosecutor said, "She has left her daughter, she has left her family, the people who were close to her, the people whom she talked to just about every day were snatched away, and Takisha Wiseman is gone," and a similar statement was made later in the closing.

- On numerous occasions in the closing, the prosecutor made statements characterizing the events in question as horrific: "the horror, the nightmare, the tragedy of four lives snuffed out because of one man"; "... how this horrible, horrible story ended.... Where these horrible facts stopped ..."; "it was then that the nightmare began."

- The prosecutor also argued that Wiseman's killer "had one sick, sinister motive ... it just wasn't murder. It was an execution followed by a burning."

### 2. Appeals to Jurors' Sense of Civic Duty to Send a Message

▮▮ Appellant reminds us that we have previously stated that "an attorney must not ask a jury to 'send a message' to anyone.... Juries are not in the message-sending business." *See Bowman v. United States*, 652 A.2d 64, 71 (D.C.1994); *see also Carpenter v. United States*, 635 A.2d 1289, 1296 (D.C.1993). We find no plain error affecting substantial rights arising from the government's closing argument, the following excerpts of which were highlighted by appellant to demonstrate his assertion that the jury was impermissibly asked to send a message:

- The prosecutor told the jury, "You've been brought together because of your civic duty. You've been brought together because [of] our belief that justice will reign. We've been brought together to enforce our laws, in our city, ourselves."

- In discussing the killing of Wiseman, the prosecution stated that, for appellant, "justice would come at the end of a[gun]," and asked the jury to "take it to the final step, to reject the notion [that Simpson committed the triple murder], to affirm our laws, to make perfectly clear that lawlessness, disorder, obstruction will not rule the day."

- The prosecutor also said that the evidence indicated that appellant felt he "was not going to be held accountable. When I began this closing argument, I talked about all of us coming together and why we were here. Today, you stand to hold the man accountable, the very man who by his own hand sent the signals indicating no, he wasn't [accountable]."

- Finally, the prosecutor stated, "And through your verdicts, let us send a loud and clear message that *this attempt* to avoid justice will not stand, that *this effort* to obstruct justice will not go unchallenged. And that our laws will be enforced in our city ourselves." [Emphasis added.]

### 3. Personal Opinion of Prosecutor

▮▮ The third category of statements challenged by appellant consists of those in which he asserts the prosecution injected personal opinion into the closing argument. *See Mitchell v. United States*, 569 A.2d 177, 184 (D.C.1990) (personal opinion of lawyer improper in arguments to jury); *Dyson v. United States*, 418 A.2d 127, 130 (D.C.1980) (same). Appellant is correct that the government's closing argument is replete with use of the words "we" and

"us," particularly in context such as "Crutchfield left *us* facts," and "*we* know graphic things." [Emphasis added.] Appellant argues that these types of statements could have been construed by the jury as expressing the opinion of the prosecutor, perhaps based on facts that had not been presented to the jury. We conclude that there is no plain error basis for reversal, as discussed below.

### 4. Analysis

We need not proceed through the statements highlighted by appellant one by one to discern whether each or all require reversal. Even considering the effect of the prosecutor's challenged statements in the aggregate, based on our precedent those statements did not compromise the fundamental fairness of the trial. Thus, we hold that the trial court's decision not to intervene *sua sponte* did not produce a clear miscarriage of justice. *See Thacker v. United States*, 599 A.2d 52, 60–62 (D.C. 1991) (plain error standard not met where closing at murder trial used phrases such as "carved up," "butchering," "body decomposing," and "bad meat"); *Mills v. United States*, 599 A.2d 775, 787 (D.C. 1991) (prosecution's description of victim's experience as "a night of living hell" not plain error); *Bowman, supra*, 652 A.2d at 71–72 (no plain error where trial court did not correct *sua sponte* "send a message" statement of prosecution); *see generally Reyes, supra*, 758 A.2d at 39–40.

Nor did the prosecutor's use of "we" and "us" appear to defense counsel or the trial judge to have been used in a way that expressed any personal opinions of the prosecutor; rather, those words appear to have been used only to describe the evidence as it may have been viewed by all observers in the courtroom, including the jury. We agree with the government that the use of "we" and "us" was a rhetorical device that was understood by the jury to mean trial observers such as themselves, and would not have been misconstrued as the personal opinion of the prosecutor. *Cf. Mitchell, supra*, 569 A.2d at 184 (characterization of government witness as "truth-telling" is improper interjection of personal opinion, but does not rise to level of plain error). Indeed, in context, the pluralizing of the argument more pointedly suggests that the facts heard at trial provide the basis for the trial participants' knowledge of exactly "who" did "what."

Further, we note that the prosecution's statement, though in terms of "send a message," does not create the same concern as the closing in *Bowman, supra*, 652 A.2d at 71, on which appellant relies, because the prosecutor here was not asking the jury to send a community message, but rather to "tell" appellant that his blame-shifting defense was incapable of casting a reasonable doubt. In any event, appellant has failed to demonstrate that the trial judge's decision not to intervene *sua sponte* amounts to plain error affecting substantial rights. *See id.* at 71–72.

Our conclusion that there was no plain error affecting substantial rights here is bolstered first by the fact that the evidence against appellant was so strong. *See Morrison v. United States*, 547 A.2d 996, 1000 (D.C.1988) ("The evidence of appellant's guilt was strong, and we are satisfied that the prosecutor's improper argument did not impermissibly sway the jury toward a guilty verdict."). Second, the judge emphasized to the jury immediately prior to the prosecution's closing that it was inappropriate for the attorneys to express any personal opinion, and that, if any expressions of opinion appeared in the closings, the jurors should disregard them. Finally, the trial court reiterated this instruction immediately after the closings as a part of the general instructions given to

the jury. *See McCoy v. United States,* 760 A.2d 164, 186 (D.C.2000) (jury is presumed to follow the instructions of the trial court (citing *Allen v. United States,* 603 A.2d 1219, 1224 (D.C.), *cert. denied,* 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992))); *Harris v. United States,* 602 A.2d 154, 165 (D.C.1992) (en banc). We conclude that these instructions ameliorated any arguable, but doubtful, impropriety in the use of "we" and "us," as well as expressions such as "send ... a message" "horror," "nightmare," and "sinister." Therefore, we find no plain error affecting substantial rights in the trial court's decision not to intervene in the absence of objection.

### 5. Objected-to Portion of Prosecutor's Closing Argument

█ Defense counsel did object at trial to one statement in the prosecution's closing argument. While attempting to refute a portion of the ostensible defense theory, the prosecutor suggested in rebuttal that the only way one could believe that events transpired in the manner suggested by defense counsel would be if Simpson had been secretly released from custody, killed Wiseman soon thereafter, gave the murder weapon to the government so that it could be planted on appellant, and returned to jail—none of which was supported by any evidence. Defense counsel objected unsuccessfully to the prosecutor's suggestion that he himself was a link in the hypothetical chain of custody of the gun.

We conclude that the prosecution was doing no more than responding to the defense theory of the case—that Simpson, rather than appellant, was the perpetrator of the triple murder—in order to point out a logical weakness in that defense. Therefore, we hold that overruling the defense objection was not error. *See Harris, supra,* 602 A.2d at 165 (stating that prosecu-

tion may respond to defense counsel's closing suggestion that police were lying).

### C. Joinder & Severance

Appellant argues, as he did at trial, both that the initial joinder of the obstruction of justice charge (Count XXV) with the charges stemming from the triple murder was impermissible under Rule 8(a), and that the trial court abused its discretion by failing to sever the charges, as requested, under Rule 14. He argues that the evidence of Wiseman's murder in Maryland as an integral part of the obstruction charge would be inadmissible in a separate trial for the triple murder. *See* Super. Ct.Crim. R. 8(a), 14. Appellant asserts further, and did so at trial, that the failure to sever led to undue prejudice.

█ We review appellant's assertions regarding the separate decisions to join the charges and to deny severance under different standards of review. *See Ray v. United States,* 472 A.2d 854, 857 (D.C. 1984). Appellant's assertion of wrongful joinder under Rule 8 presents a question of law and is thus subjected to *de novo* review, whereas Rule 14 severance for prejudice is committed to the sound discretion of the trial court and we will not reverse absent a compromise of the fairness of the trial. *See id.*

### 1. Joinder

█ Under Rule 8(a), offenses may be charged in the same indictment-and thus tried together-if they "are based on the same act or transaction." Super. Ct.Crim. R. 8(a); *see also Loukas v. United States,* 702 A.2d 681, 682 (D.C.1997).

Appellant argues that the joinder was not proper here because the obstruction took place weeks after the triple murder, in a different locality, with a different weapon, and utilizing a different *modus operandi.* However, we note that the evi-

dence available to the trial court demonstrated a substantial factual relationship between the triple murder and the Wiseman murder. Among other circumstances, it may fairly be inferred that Wiseman was murdered and her body burned because of her knowledge about the triple murder, and the weapons from the two separate murders were found together among appellant's belongings in a search following his arrest. As to the different locations of the two crimes, we note that the location in Maryland where Wiseman's body was discovered was very close to the home of appellant's mother, a fact which weighs against appellant's assertion because it fortifies the substantial factual relationship between the triple murder and Wiseman's murder.

██ We have held that separate charges bear a transactional relationship when one crime supplies the motivation for the second crime, as here, and that "substantial connection[s]" between charges will support joinder under Rule 8(a). *See Sweet v. United States*, 756 A.2d 366, 375 (D.C.2000) (permitting joinder under Rule 8(a) where evidence showed that motive for killing second victim was to prevent her from assisting police with investigation into first murder). Because joinder of the obstruction charge with the other counts was based on substantial connections among them, we hold that the joinder was not erroneous. *See Sweet, supra.*

*2. Severance*

██ In deciding whether to sever under Rule 14, the trial court throughout the trial balances "the possibility of [impermissible] prejudice to the defendant[ ] against the legitimate probative force of the evidence and the interest in judicial economy." *Bittle v. United States*, 410 A.2d 1383, 1386 (D.C.1980), *quoted in Byrd v. United States*, 502 A.2d 451, 452 (D.C. 1985). "There can be no [undue] prejudice, however, if evidence of each offense is admissible in a separate trial for the other." *Byrd, supra,* 502 A.2d at 452; *see also Winestock v. United States,* 429 A.2d 519, 524 (D.C.1981). Whether evidence is mutually admissible involves an analysis of both the relevance of the evidence of one crime to the prosecution of another crime and vice versa, and whether the probative value of the evidence in question is "substantially outweighed by the danger of unfair [or impermissible] prejudice." *Johnson v. United States,* 683 A.2d 1087, 1101 (D.C.1996) (en banc) (quoting FED. R. OF EVID. 403). As appellant concedes, evidence of the triple homicide would be admissible in a separate trial for the obstruction count to show motive. Therefore, the outcome of this issue turns upon whether the evidence of the obstruction count (based on Wiseman's murder) would be admissible in a separate trial for the triple murder. We conclude that it would be admissible on two grounds—as evidence of appellant's consciousness of guilt, and as direct evidence of the triple homicide.[5]

---

**5.** Given these bases, we need not analyze the admissibility of the obstruction evidence under the *Drew* exception for proving identity. *See generally Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964).

Mutual admissibility of evidence in separate trials is determined generally by applying a *Drew* analysis. *Roper [v. U.S.], supra,* 564 A.2d [726] at 731. However, the *Drew* analysis is not required where the evidence is "not independent of the crime charged

and the evidence is direct proof of the crime charged...."

*Sweet, supra,* 756 A.2d at 376 (quoting *Johnson, supra,* 683 A.2d at 1101). "Drew does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Johnson, supra,* 683 A.2d at 1098,

First, the evidence related to Wiseman's murder serves doubly as direct evidence of both the obstruction charge and the triple murder because the separate killings were not independent of one another. Rather, "the same evidentiary stream" runs through them, as we demonstrate below in our discussion of the close interrelatedness of the evidence. *Johnson, supra,* 683 A.2d at 1098. In *Johnson,* we considered a situation very similar to the one before us where evidence of an uncharged Maryland murder had been admitted to prove identity in the trial for a murder that took place in the District of Columbia. The evidence showed that the Maryland murder had been committed to cover up the District of Columbia murder, that the defendants and the Maryland victims knew each other, and that the same gun was used in both slayings. *See id.* at 1098. This court held that the factual circumstances provided such close connections between the two incidents that evidence of the Maryland murder was actually admissible as direct evidence of the District of Columbia slaying and, therefore, the constraints on the use of the evidence under *Drew* were not even applicable. *See id.* at 1096–98 The same is true here. Thus, because of the close factual ties between the two events, evidence of Wiseman's killing was admissible as *direct evidence* of appellant's guilt in the triple murder.

The evidence of Wiseman's killing was also admissible to demonstrate appellant's "consciousness of guilt" in the triple slaying, and that is the specific ground on which the trial court denied severance and admitted the evidence. *Byrd, supra,* 502 A.2d at 452. Although *Byrd* and its progeny deal with instances of *verbal* obstruction of justice whereby the defendants either threatened or cajoled witnesses in order to prevent their testimony, *see, e.g.,*

*Smith v. United States,* 312 A.2d 781, 784–85 (D.C.1973) (testimony that defendant threatened a witness constituted particularly relevant evidence of implied consciousness of guilt), the facts of the case before us are sufficient to permit the inference that appellant killed Wiseman in order to prevent her from cooperating with the triple murder investigation. Appellant was certainly aware that he could become implicated in the triple homicide, given that Simpson remained incarcerated in connection with the incident and that Wiseman was privy to information that would be highly damaging in the event of appellant's prosecution.

A wide range of evidence linked appellant to Wiseman's demise and provided strong circumstantial evidence of his motive to prevent her from speaking to the authorities about the triple murder: the fact that Wiseman accompanied appellant to the triple murder scene; appellant's statement to Wiseman admitting that appellant had committed the triple murder; Wiseman's statements indicating her ongoing relationship with appellant after the crime; Simpson's attempts to get Wiseman to speak with investigators; Wiseman's friendship with Simpson, who remained in custody for the triple murder; Wiseman's increasingly nervous behavior prior to her death; the burning of Wiseman's corpse, suggesting that appellant wanted to prevent her murder from coming to light in the triple murder investigation; discovery of her remains in a field near the home of appellant's mother, where appellant had stayed until learning the police were looking for him; appellant's change of residence upon learning that the police were looking for him; and discovery of the firearms, forensically linked to the triple murder and Wiseman's

*quoted in Bright v. United States,* 698 A.2d 450, 455 (D.C.1997).

murder, *together* among appellant's possessions in the apartment where he was staying.

This evidence provides a compelling basis for concluding that the evidence of the obstruction murder would have been admissible in a separate trial of the triple murder both as evidence of appellant's consciousness of guilt and as direct evidence that Wiseman's killer also committed the triple murder. *See Johnson, supra,* 683 A.2d at 1097–98.

Having established the relevance of evidence of Wiseman's murder, we come to the "critical inquiry [as to] whether the 'probative value [of Wiseman's murder is] substantially outweighed by the danger of unfair prejudice' in a separate trial" for the triple murder. *Bright, supra* note 5, 698 A.2d at 456 (quoting *Johnson, supra,* 683 A.2d at 1099).

In *Bright,* we reversed a conviction for possession of ammunition because the trial court had abused its discretion by failing to grant severance where joinder of the ammunition charge with two counts of premeditated first degree murder created an "extreme risk of [impermissible] prejudice" under the particular facts of the case. *Bright, supra* note 5, 698 A.2d at 456. In reaching that conclusion, we determined that the extensive and explicit evidence of the "heinous" murders would so overwhelm the jury's consideration of the ammunition charge that the trial court would have been unable to protect the integrity of the trial on that count, even with specific instructions to the jury. *Id.* Thus, we concluded, the evidence of the murders would not have been admissible in a separate trial for the ammunition charge and the trial court's failure to sever was in error. *See id.*

Here, the execution-style slaying of Wiseman and the burning of her body are comparably "heinous" to the murders in question in *Bright. See id.* However, unlike the ammunition charge in *Bright,* the triple murder charge involves a situation at least as outrageous as Wiseman's murder, and was proved by graphic evidence that was at least as likely to shock the jury as the Wiseman murder evidence. The victims of the triple murder were forced to lie on top of one another and then were riddled with bullets from a machine gun at close range. Based upon the parity of the two crimes, we are convinced that they are sufficiently comparable that the jury would not have been likely to "reach[ ] conclusions about [appellant's] proclivity for violence before it was satisfied" beyond a reasonable doubt on the triple murder counts. *Johnson, supra,* 683 A.2d at 1095. Thus, evidence of Wiseman's murder would not have the tendency to prejudicially overwhelm the evidence of the triple murder in the way that evidence of a violent murder would overwhelm a mere ammunition charge as in *Bright.*

On the probative value side of the calculus of admissibility of evidence, pursuant to *Easton v. United States,* 533 A.2d 904, 906 (D.C.1987), we also consider as a factor the prosecution's need for the evidence in question. The need for evidence depends upon what issues in the case are difficult to prove, as well as which factual matters are challenged by the defense such that additional evidence is needed for rebuttal. *See id.* Appellant's theory in the case before us was that the triple murder had been committed by Simpson and that appellant had been wrongly accused. Evidence of Wiseman's murder and the factual connections between the two events served an important role in bolstering the proof that appellant committed the triple murder. Because the identity of the perpetrator of the triple murder was a strongly contested issue, any evidence that helped resolve that issue had heightened relevance.

We conclude that the probative value of the evidence of Wiseman's murder was not substantially outweighed by the danger of impermissible prejudice because it was unlikely that the jury regarded the facts of Wiseman's murder as evidence of a general proclivity of appellant to behave violently, and because of the "unique relationship between the evidence and the lone contested issue, identity." *Johnson, supra,* 683 A.2d at 1095. Accordingly, because the evidence of the obstruction murder would have been admissible in a separate trial of the triple murder as direct evidence and proof of appellant's consciousness of guilt, we conclude that the trial court neither erred in permitting joinder of the charges under Rule 8(a), nor abused its discretion in denying severance under Rule 14.

### D. *Wiseman as a Prosecution Witness Under D.C.Code § 22–722(a)*

 At the close of the government's case, and again after the defense rested, defense counsel moved for a judgment of acquittal (MJOA) on the obstruction count, challenging the sufficiency of evidence that Takiesha Wiseman qualified as a witness under the District of Columbia obstruction statute, D.C.Code § 22–722 (1996). We conclude that the MJOA was not wrongly denied because appellant has misconstrued the requirements of the obstruction statute as to the meaning of "witness," and because we find that the evidence was sufficient to overcome the motion.

Appellant asserts that, even if he was responsible for Wiseman's death, the government's evidence was insufficient to show beyond a reasonable doubt that Wiseman qualified as a witness under the obstruction statute or that he specifically intended to prevent her from testifying.[6]

 Appellant states correctly that, by the plain meaning of its terms and according to legislative history, § 22–722(a)(2) requires a specific intent to obstruct justice. *See* D.C.Code § 22–722(a)(2) (1996); *see also* Council of the District of Columbia, Committee on the Judiciary, Report on Bill 9–385, "Law Enforcement Witness Protection Act of 1992," at 3 (noting that specific intent is required for obstruction of justice under the bill which was passed and became the current § 22–722). The relevant portion of the statute states:

A person commits the offense of obstruction of justice if that person:

(2) *Knowingly* uses intimidating or physical force, threatens or corruptly persuades another person, or by threatening letter or communication, endeavors to influence, intimidate, or impede a witness or officer in any official proceeding, *with intent to:*

(A) Influence, delay, or prevent the truthful testimony of the person in an official proceeding; ....

D.C.Code § 22–722(a)(2) (1996) (emphasis added). However, appellant misinterprets the obstruction statute's use of the term witness to mean only a person whom a defendant knows to have already assented to testify or otherwise cooperated in an ongoing official proceeding.

In *Smith v. United States,* 591 A.2d 229 (D.C.1991), we addressed the scope of the word "witness" and held that it means a person who (1) "knows or is supposed to know material facts about a case which is pending," and (2) "*may* be called to testify" about that knowledge. 591 A.2d at 231 (emphasis added) (quoting Extension of Comments of the chairperson of the Committee on the Judiciary, July 20, 1982, on

---

**6.** Appellant concedes that the evidence may have demonstrated some measure of motive for him to eliminate Wiseman, but he contends that it was insufficient to show specific intent.

proposed § 722). The appellant in *Smith* was convicted on two counts of obstruction of justice under the previous version of § 22–722 [7] based on his acts following his arraignment for murder. *See Smith, supra,* 591 A.2d at 230. Smith approached two of his associates, one of whom was with Smith at the scene of the crime just prior to the killing, and asked them both to lie and say that they had witnessed another man kill the victim. *See id.* Smith challenged both obstruction convictions, arguing that neither of the two men whose potential testimony he attempted to impede qualified as a "witness" under the obstruction statute. *See id.* at 231–32. He argued that one of the two purported witnesses should not have been considered a witness because the government had presented no evidence that the man was expected to testify *at the time Smith approached him. See id.* at 231. Because the man had accompanied Smith to the general area of the killing, we held that he qualified as a witness under the statute because he "clearly had knowledge of relevant facts immediately surrounding the offense" and therefore "may" have later been called to testify. *Id.* at 232.

Likewise, viewing the evidence in the record before us in the light most favorable to the government, the jury could reasonably have found beyond a reason-able doubt that Wiseman "had knowledge of relevant facts immediately surrounding the offense," *id.,* because she had accompanied appellant to the crime scene along with Simpson and had heard his admission about the triple murder, and because appellant had told the two women that he planned to collect on a debt owed to him by Edwin Knight. Moreover, additional evidence showed that Wiseman participated in several conversations about the shooting, during one of which appellant told Simpson not to contact the police and said that "he was going to get whoever it was [who] didn't die," apparently referring to Edwin Knight.[8] Furthermore, additional circumstantial evidence supports the inference that Wiseman was privy to relevant information. Foxworth testified (1) that Wiseman stated that she and a friend had killed someone before she retracted the statement ambiguously; (2) that Wiseman seemed nervous and withdrawn after the triple murder; and (3) that, although she denied any wrongdoing, Wiseman appeared to be aware that the police were looking for her.

As to the second witness in his case, Smith argued that because the man had not been present at or near the murder scene, he should not have been considered a witness for obstruction purposes because

---

7. The prior version of the obstruction statute was codified at D.C.Code § 22–722(a)(1) (1989). The fact that *Smith* was decided under the previous version of § 22–722 does not rob *Smith's* analysis of its vigor in this case. The latest version of the obstruction statute did nothing to alter or narrow the definition of witness as interpreted in *Smith.* In fact, the most recent version of § 22–722 sought to *expand* the scope of the earlier version "to encompass the wide[ ]range of activities used by criminals to impede justice." Council of the District of Columbia, Committee on the Judiciary, Report on Bill 9–385, "Law Enforcement Witness Protection Act of 1992," at 2.

8. Much of this evidence was provided at trial through Simpson, whose reliability as a witness appellant challenges because Simpson was a co-defendant in the case who cooperated with the prosecution against appellant. However, the jury heard cross-examination to this effect, and had the opportunity to view Simpson's demeanor on the witness stand and assess her credibility. Because we must view the evidence on a challenge to denial of a MJOA in the light most favorable to the government, we may only conclude that even knowing of her potential motivation to inculpate appellant, the jury permissibly credited Simpson's testimony.

he had no knowledge of relevant facts *until after Smith had approached him. See id.* at 232. This court held that the man qualified as a witness under § 22–722 because, by approaching the man and asking him to lie, Smith himself had vested the man with the relevant knowledge that Smith was somehow involved in the murder. *See id.*

Here, appellant admitted to Wiseman immediately after the triple murder, "that was his high ... blowing his clip [shooting]" the victims. Thus, even if Wiseman had not derived any relevant information from her presence near the scene of the crime and subsequent conversations with appellant and Simpson, she certainly was apprised of highly relevant facts by appellant himself, and therefore may also be considered a witness under the second part of *Smith.*

█ Appellant counters that Wiseman was decidedly *not* a witness because several of her statements admitted into evidence denied knowledge of the triple murder or indicated her reluctance to participate in the murder investigation. Appellant is misguided, however, because obstruction of justice is a specific intent crime and the pertinent inquiry, as touched upon in *Smith,* is whether *appellant* was aware that Wiseman knew material facts about the triple murder to which she might later testify. *See id.* at 231 & n. 2. Thus, it is largely irrelevant that Wiseman had not cooperated with authorities investigating the murder and that she had made statements to friends denying any knowledge.

Moreover, appellant had a reasonable expectation that Wiseman might be called to testify given appellant's awareness of her knowledge of relevant facts—the most damning of which had been related to her by appellant himself—and his continued contact with her. Furthermore, the evidence at trial demonstrated that shortly after the triple murder, Wiseman left her apartment never to return, but called friends on several occasions and indicated that she and appellant were "all right," permitting the inference that she was with him. Appellant's aunt also testified that on December 30, 1996, appellant visited her office, accompanied by Wiseman, and inquired as to the status of the case against Simpson. Wiseman learned from her friend Foxworth that a police detective was looking for her, and in a telephone conversation, Simpson advised Wiseman that she should contact the same detective regarding the case. Although Wiseman never spoke with any authorities about the case, it was obvious from the evidence that she knew the police were interested in speaking with her about it. Given her continued association with appellant, it would have been a reasonable jury inference that appellant also knew that the police sought Wiseman for her knowledge about the triple murder.

Accordingly, we hold that sufficient evidence existed for the jury to have found beyond a reasonable doubt that appellant was well aware that Wiseman knew facts material to the investigation of the triple murder and might, at some future time, impart that knowledge to investigators or a court as a witness within the meaning of the obstruction of justice statute.

### E. *Official Proceeding Under D.C. Code § 22–722*

█ Appellant also contends that the government failed to demonstrate that he was aware of any grand jury investigation into the triple murder or other "official proceeding" in progress at the time of Wiseman's murder, and that, again, the evidence on the obstruction count was insufficient to support the jury's verdict. Appellant's argument stems from a flawed

reading of the language of the obstruction statute and it ignores ample evidence of appellant's awareness of an ongoing investigation into the triple murder, which qualifies as an official proceeding under the obstruction statute.

Section 22–721 serves as the definition section for the subchapter of the code proscribing obstruction of justice. D.C.Code § 22–721 (1996). Subsection (4) defines the term "official proceeding" broadly to mean "any trial, hearing, *investigation,* or other proceeding in a court of the District of Columbia *or conducted by . . . an agency or department of the District of Columbia government . . . .*" D.C.Code § 22–721(4) (1996) (emphasis added). Subsection (3) further defines "criminal investigation" as "an investigation of a violation of any criminal statute in effect in the District of Columbia." D.C.Code § 22–721(3) (1996).

Evidence at trial showed that on December 30, 1996, less than two weeks before Wiseman's death, she and appellant were at the courthouse office of appellant's aunt inquiring as to the status of the case against Simpson pertaining to the triple murder. Further, within a day of her estimated time of death, Wiseman called a relative who worked at the courthouse to find out "what was going on with the case" of Simpson. Thus, the jury could have inferred beyond a reasonable doubt that appellant was aware that an investigation into the triple murder, an "official proceeding" under the statute, was in progress, and that Wiseman had knowledge that would have been relevant to that investigation, regardless of the identity of the prime suspect.

 Appellant argues further that even if such an "official proceeding" was occurring, because it did not target him or Wiseman, he could not be found guilty of obstructing it. Again, appellant miscon-

strues the obstruction statute, the plain language of which makes no requirement that one necessarily be the *target* of the official proceeding that he is charged with obstructing. *Cf. Woodall v. United States,* 684 A.2d 1258 (D.C.1996) (upholding conviction under § 22–722 of defendant who was not a participant in the murder the investigation of which he was accused of obstructing).

### F. Admission of Wiseman's Out-of-Court Statements Under Devonshire v. United States

Appellant challenges the pre-trial ruling under *Devonshire v. United States* to admit Wiseman's out-of-court statements. 691 A.2d 165 (D.C.), *cert denied sub nom. Vines v. United States,* 520 U.S. 1247, 117 S.Ct. 1859, 137 L.Ed.2d 1060 (1997). In *Devonshire* we held that a defendant who has killed "a potential witness, who is expected to give damaging testimony against the killer in some future proceeding, waives the right under the Confrontation Clause of the Sixth Amendment [and on hearsay grounds] to object to the admission of that witness's out-of-court statements." *Id.* at 166. Appellant argues first that the trial court abused its discretion because its ruling was made solely on the basis of a government proffer, despite defense counsel's requests for an evidentiary hearing. Appellant's second contention, similar to his challenge to the sufficiency of the evidence supporting his conviction of obstruction, *see supra* Part D., argues that, even if it was permissible for the trial court to rule based upon a proffer, the government's proffer here failed to demonstrate by a preponderance of the evidence that Wiseman was a witness. Therefore, according to appellant, Wiseman's statements should not have been admitted.

## 1. Procedural Background

At a pretrial proceeding, the trial court considered the government's motion in limine which sought admission of several statements about appellant made by Wiseman to her friends during the weeks between the triple murder and her own demise. The government proffered a broad array of mutually supportive witness testimony and direct evidence to show that Wiseman had damaging testimony to give and that appellant killed Wiseman. We need not repeat this evidence here as it was substantially the same as the evidence presented at trial and detailed in our discussion of the sufficiency of the evidence of obstruction. *See supra* Part D. Defense counsel argued at length that the proffer was not sufficient to establish either that appellant had killed Wiseman, a contention not raised on appeal, or that Wiseman was a potential witness within the meaning of *Devonshire*. Defense counsel's own proffer, however, showed only (1) that Simpson, whose expected testimony formed a large portion of the government's proffer, had made several inconsistent statements regarding the triple murder and was unreliable because she was seeking to shift blame onto appellant, and (2) that Wiseman had denied knowledge of the triple murder and had not spoken with investigators about the case.

Over defense counsel's assertions that an evidentiary hearing was required, the trial court determined that, under the circumstances of the case, the evidence proffered by the government was sufficient for it to determine by a preponderance of the evidence, and likely even by clear and convincing evidence,[9] that appellant had killed Wiseman and that she was a witness within the meaning of *Devonshire*. *See*

*Devonshire, supra,* 691 A.2d at 169 (predicate facts need only be proven by preponderance of evidence). As a part of its ruling, the trial court noted that the same evidence would, of necessity, be presented at trial and subjected to cross-examination because it would also go toward proving the obstruction count to the jury. The trial court stated that it would monitor the evidence as it unfolded to ensure that the evidence proffered was actually presented, and to confirm that the evidence at trial actually met the preponderance standard. Indeed, as the trial court pointed out, the government took a strategic gamble by proceeding by proffer because the possibility existed that the court would not be satisfied by trial evidence or that the jury would acquit on the obstruction count, thereby calling into question the sufficiency of the proffered evidence and risking a mistrial on all counts affected by Wiseman's statements.

## 2. Proffer vs. Evidentiary Hearing

The parties agree that our review of this issue is for abuse of discretion by the trial court. *Cf., e.g., Groves v. United States,* 564 A.2d 372, 374 (D.C. 1989), *amended on other grounds by* 574 A.2d 265 (1990). Appellant is correct that we declined to decide conclusively in *Devonshire* whether the trial court in that case properly considered this issue by means of a proffer rather than an evidentiary hearing. *See Devonshire, supra,* 691 A.2d at 170 & n. 9 (reviewing this issue for plain error, and finding none, because appellant failed to raise at trial). We are now presented with that question and hold that under the circumstances of this case it was not an abuse of the trial court's discre-

---

9. The clear and convincing standard is not applicable here. The trial court simply mentioned it as make-weight in the course of discussing the strength of the proffered evidence.

tion to refuse defense counsel's request for an evidentiary hearing.

In a number of comparable situations, we permit trial courts to proceed by proffer to determine the predicate for admissibility of evidence. One such situation is for determining the admissibility of "other crimes," or *Drew*, evidence. In *Daniels v. United States*, we held that a "trial court may act within its discretion to conduct its pretrial inquiry on the admissibility of the other crimes evidence by means of a 'detailed proffer from the government' instead of holding, in effect, a bench trial of the other crime, which presumably will be fully replicated before the jury if admitted." 613 A.2d 342, 347 (D.C.1992) (citing *Groves, supra*, 564 A.2d at 374); *cf. Carter v. United States*, 684 A.2d 331, 344 (D.C.1996) (en banc) (proffer proper to fulfill required conditions to begin process of obtaining immunity for defense witness); *Winfield v. United States*, 676 A.2d 1, 4 (D.C.1996) (en banc) (proffer may be proper for defense to show predicate facts for admission of evidence that other individual committed offense); *District of Columbia v. Whitley*, 640 A.2d 710, 713–14 (D.C.1994) ("prosecutor's proffer, together with all reasonable inferences that may be drawn," sufficient to overcome defense motion for judgment of acquittal).

Nor do the cases cited by appellant lead to a conclusion that an evidentiary hearing was required in this case. *United States v. Thornton*, 147 U.S.App. D.C. 114, 124, 454 F.2d 957, 967–68 (1971), and *Duddles v. United States*, 399 A.2d 59, 60 (D.C. 1979), each stated that an evidentiary hearing might be required to resolve matters unrelated to the *Devonshire* waiver

rule, but those grounds differ significantly and both cases only require such a hearing after a showing of factual allegations that would warrant a trial within a trial.[10] Even if *Thornton* and *Duddles* were applicable here, defense counsel, despite arguing assertively about perceived shortcomings in the government's proffer, failed to proffer a factual basis sufficient to necessitate an evidentiary hearing.

At least one federal appeals court has considered the issue before us under the federal analogue to *Devonshire*. The Eighth Circuit ruled that an evidentiary hearing was not required to determine the admissibility of statements made by a witness killed by the defendant: "the repetition necessarily inherent with a preliminary hearing would amount to a significant waste of judicial resources." *United States v. Emery*, 186 F.3d 921, 926 (8th Cir.1999), *cert. denied*, 528 U.S. 1130, 120 S.Ct. 968, 145 L.Ed.2d 839 (2000).

Our determination that a hearing was not required in the case before us is bolstered by the aggregation of several circumstances which ensured that admission of Wiseman's statements was conditioned on the ongoing satisfaction of the preponderance standard until those statements reached the jury. Most relevant of these circumstances are the following: the government had to present the same evidence at trial to prove the obstruction count; the trial court recognized explicitly that it would have to monitor the evidence at trial to ensure that the proffer was fulfilled and that the equation of admissibility remained valid; the government's proffer was extensive; and the defense was afforded an

---

10. The other cases relied on by appellant have no direct relevance. One requires a hearing under very different circumstances, *see In re F.G.*, 576 A.2d 724, 725 (D.C.1990) (en banc) (evidentiary hearing required to suppress show-up identification), and the others dis-

cuss what factors would trigger the need for a hearing on § 23–110 collateral attack, *see Reaves v. United States*, 694 A.2d 52, 57 (D.C. 1997); *Miller v. United States*, 479 A.2d 862, 869 (D.C.1984) (same).

equally extensive opportunity to rebut the proffer, but failed to proffer any significant evidence to counter the factual allegations of the government.

Moreover, defense counsel made the trial court aware of Wiseman's original denial of knowledge and lack of cooperation prior to the court's ruling on admissibility so that they were a part of the calculus of the decision. As to the defense's evidence that called into question Simpson's reliability as the conduit of some of Wiseman's statements, the trial court took note of the issue and, at trial, the defense had an opportunity to cross-examine Simpson as to her inconsistent statements and relevant bias. In the absence of a more substantial and persuasive proffer by the defense, the trial court would have gained nothing from an evidentiary hearing that could have caused it to reach a contrary conclusion. *See Daniels, supra,* 613 A.2d at 347.

*3. Sufficiency of the Proffer*

▮▮▮▮ Nearly identical to his challenge to the sufficiency of the evidence supporting his obstruction conviction, is appellant's argument that the proffer failed to show that Wiseman was a witness within the meaning of *Devonshire* because she denied relevant knowledge of the triple murder and had not cooperated with the authorities investigating that case. In order to overcome the defendant's right to object to the slain declarant's statements, "the government need only establish the predicate facts [that appellant procured the declarant's unavailability and that the declarant qualifies as a witness] by a preponderance of the evidence." 691 A.2d at 169. We hold that the proffer was sufficient to meet the preponderance standard because we conclude that Wiseman qualifies as a witness for the purposes of waiver under *Devonshire*.

Although neither *Devonshire* nor the sole District of Columbia case relying on it thus far, *see Sweet, supra,* 756 A.2d at 379, defined "potential witness," the First Circuit case which was relied upon by *Devonshire* discussed the issue in some detail. *See United States v. Houlihan,* 92 F.3d 1271 (1st Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). In *Houlihan,* the appellants argued that the decedent was not an actual witness because no charges had been lodged against them at the time of his slaying. *See id.* at 1279. The *Houlihan* court held:

> When a defendant murders an individual who is a percipient witness ... to prevent him from appearing at an upcoming trial, he denies the government the benefit of the witness's live testimony. In much the same way, when a defendant murders such a witness ... to prevent him from assisting an ongoing criminal investigation, he is denying the government the benefit of the witness's live testimony at a future trial. In short, the two situations are fair congeners: as long as it is reasonably foreseeable that the investigation will culminate in the bringing of charges, the mere fact that the homicide occurs at an earlier step in the pavane should not affect the operation of the waiver-by-misconduct doctrine. Indeed, adopting the contrary position urged by the appellants would serve as a prod to the unscrupulous to accelerate the timetable and murder suspected snitches sooner rather than later. We see no justification for creating such a perverse incentive, or for distinguishing between a defendant who assassinates a witness on the eve of trial and a potential defendant who assassinates a potential witness before charges officially have been brought. In either

case, it is the intent to silence that provides notice.

*Id.* at 1279–80.

The rationale of *Houlihan* fully complements the stated purpose behind *Devonshire* to prevent "a mockery of the system of justice" that would arise from "a defendant deriving benefits from murdering [witnesses] against him." *See Devonshire, supra,* 691 A.2d at 168 (quoting *United States v. Thevis,* 665 F.2d 616, 630 (5th Cir.1982)). We may also look to our definition of the term "witness" under the obstruction statute and *Smith,* discussed *supra* Part D., which is, at a minimum, instructive since both the obstruction statute and *Devonshire* are aimed at deterring the elimination of witnesses by defendants.

*Devonshire* stated that the term "potential witness" includes those individuals "expected to give damaging testimony" in "some future proceeding." *See Devonshire, supra,* 691 A.2d at 166. This language tracks roughly the language in *Smith* that defines a witness for obstruction purposes, in part, as one "supposed to know material facts." *Smith, supra,* 591 A.2d at 231. Further, the use of the adjective "potential," modifying "witness" in *Devonshire,* was also used in *Smith* to describe a witness for obstruction purposes as being one who "*may* be called to testify." *Smith, supra,* 591 A.2d at 231 n. 3 (emphasis added). Moreover, the objective of the waiver rule under *Devonshire* is to prevent impediments to justice in the form of witness elimination, *see Devonshire, supra,* 691 A.2d at 168, the same purpose as § 22–722. *See* Council of the District of Columbia, Committee on the Judiciary, Report on Bill 9–385, "Law Enforcement Witness Protection Act of 1992," at 2 (discussing the bill passed and codified at D.C.Code § 22–722 (1996)).

The close similarities between these two provisions dictate that those who qualify as witnesses under the obstruction statute likewise qualify as potential witnesses under the waiver rule of *Devonshire.* Our review of the record confirms that the pretrial evidence proffered by the government to show that appellant killed Wiseman, and that she therefore qualified as a witness under *Devonshire,* was essentially the same as that presented at trial to prove the obstruction charge. Rather than restating that evidence, therefore, we refer to our discussions of the evidence within both our analysis of the sufficiency of the evidence of the obstruction count, *see supra* Part D., and our analysis of the admissibility of the obstruction evidence in a trial for the triple murder, *see supra* Part C. We conclude that the proffered evidence was more than sufficient to show by a preponderance of the evidence that appellant knew Wiseman had damaging knowledge to which she potentially would testify at some future proceeding. Therefore, the trial court did not err in finding that appellant had waived his right to object to admission of Wiseman's statements under *Devonshire.*

### G. Obstruction Count Jury Instructions and Burden of Proof

Appellant argues that the jury instructions on the obstruction count unconstitutionally diminished the government's burden of proof below the "beyond a reasonable doubt" standard because, as part of the instruction on the definition of "witness," the court instructed that there must have been a "*reasonable expectation*" that Wiseman would testify.

A jury instruction which lowers the standard of proof below the reasonable doubt standard is unconstitutional and subject to reversal. *See Sullivan v. Louisiana,* 508 U.S. 275, 278–81, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). However, we do not have that situation before us. The jury

instructions at appellant's trial explicitly set the appropriate standard of proof for the obstruction statute and the meaning of the term witness pursuant to *Smith*. The trial judge instructed the jury that it had to find each of the elements of obstruction of justice *beyond a reasonable doubt*, including:

> [t]hat the defendant knew or believed that Takisha Wiseman was a witness.
>
> The term "witness" means a person who knows or is supposed to know facts material to the case then pending, and who *may* be called to testify. The government need not prove that the person was certainly going to be called but must prove that there was a reasonable expectation.... [Emphasis added.]

Moreover, the trial judge emphasized the importance of the jury's finding that Wiseman was a witness by specifically instructing them, "If you have a reasonable doubt that Takisha Wiseman was a witness (as defined in the obstruction of justice instruction), you must find the defendant not guilty of obstruction of justice."[11] The fact that the instruction referred to a "reasonable expectation" does not render that instruction improper because that phrase refers strictly to the expectation within the mind of appellant as to whether Wiseman would at some point testify. The jury was still required to find beyond a reasonable doubt that appellant had such an expectation. It would certainly be possible for a defendant to obstruct the testimony of a person within the meaning of the statute, even under a belief that the person was only somewhat likely to testify against him (as, for example, if the person were a loyal friend), so long as the defendant's belief rose to the reasonable expectation level. *See Smith, supra,* 591 A.2d at 232 ("whether the person 'may' be called to testify"; "whether there is a reasonable expectation [by the defendant] to that effect"). Because the given jury instructions required the jury to be convinced beyond a reasonable doubt that appellant had a reasonable expectation that Wiseman was a witness, the requisite standard of proof was not diminished in this case.

### H. Vicinage and Subject Matter Jurisdiction

■ Appellant characterizes his prosecution on the obstruction of justice charge as a trial in the District of Columbia for a Maryland homicide in violation of both the so-called rule of vicinage[12] and our jurisdictional statute. *See* D.C.Code § 11–923(b)(1) (1995). Vicinage is defined variously as "the place where a crime is committed or a trial is held," or "the locale from which the accused is entitled to have jurors selected." BLACK'S LAW DICTIONARY

---

11. Appellant also challenges this cross-reference to the definition of witness because it was not included in the instructions approved by defense counsel. However, this argument is essentially the same as the one discussed above because appellant argues that it diminished the government's burden of proof and created a "reasonable likelihood" that the jury convicted appellant under that reduced standard. *See Proctor v. United States,* 685 A.2d 735, 739 (D.C.1996). Further, jury instructions should be considered as a whole, not piecemeal, and the trial court's clarification by way of cross-reference added nothing to the instructions that was not already inherent. Moreover, the trial court has "broad discretion in fashioning appropriate jury instructions, and its refusal to grant a request for a particular instruction is not a ground for reversal if the court's charge, considered as a whole, fairly and accurately states the applicable law." *Nelson v. McCreary,* 694 A.2d 897, 901 (D.C.1997) (quoting *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 625 (D.C.1986)).

12. *See* U.S. Const. Art III, § 2, cl. iii ("Trial shall be held in the State where the said Crimes shall have been committed"); *see also* U.S. Const. Amend. VI.

1561 (7th ed.1999); *see also United States v. Brennan*, 183 F.3d 139, 145 n. 5 (2d Cir.1999). Appellant uses the term in a jurisdictional sense whereby the location of the offense determines the venue in which trial for that offense may be held. Section 11–923(b)(1) has been interpreted as limiting jurisdiction to criminal acts which occur within the geographical boundaries of the District of Columbia. *See United States v. Baish*, 460 A.2d 38, 40 (D.C.1983). Appellant contends that, because the murder of Wiseman took place wholly in Maryland, the Superior Court lacked subject matter jurisdiction to hear an obstruction charge stemming solely from the Maryland murder.

■ This court, however, has soundly rejected appellant's argument. As here, the appellant in *Ford v. United States*, 616 A.2d 1245, 1251–52 (D.C.1992), was charged with obstruction of justice [13] in the District of Columbia for actions that took place wholly in Maryland. Like Crutchfield, Ford argued that the Superior Court lacked subject matter jurisdiction to hear the case. *See id.* However, addressing the issue for the first time, this court considered the corpus of legal literature on the matter and concluded, in accord with "the holdings of an overwhelming majority of federal courts that a prosecution [ ] for obstruction of justice, 'may be brought in the district where the judicial proceeding that the accused sought to obstruct is pending, even if the obstructing acts took place in a different district.' " *Ford, supra*, 616 A.2d at 1253–54 (quoting *United States v. Frederick*,

835 F.2d 1211, 1213–14 (7th Cir.1987)). Accordingly, because the obstruction of justice count against appellant charged that Wiseman's murder, regardless of its location, "impeded a witness" in the District of Columbia's investigation and eventual trial in the triple murder, jurisdiction in the Superior Court was proper under D.C.Code § 22–722(a)(2) (1996).

## I. Constructive Amendment of Indictment

■ Appellant contends that the prosecution and the trial court constructively amended the indictment for the obstruction of justice. He points to the wording of the original grand jury indictment, which read "within the District of Columbia, Darryl D. Crutchfield endeavored to influence, intimidate, and impede a witness." Appellant argues that at trial, the prosecution constructively amended the indictment by establishing that Wiseman was killed *in Maryland* rather than in the District of Columbia.[14] Further, appellant asserts that the trial court sustained the constructive amendment by phrasing the jury instruction on this count such that the obstructive act was no longer required to have been committed within the District of Columbia.

The predicate for this argument is destroyed by our holding, above, and in *Ford, supra*, 616 A.2d at 1251–54. Thus, even if this point had been raised at trial— it was not—it is without merit. *See id.* at 1251–52, (holding that the phrase "within the District of Columbia" in the indictment

13. The appellant in *Ford* was charged under an earlier version of the obstruction of justice statute, but the differences between the versions have no effect on the analysis herein. *Compare* D.C.Code § 22–722 (1996), *with* D.C.Code § 22–722 (1989).

14. The presentation of evidence proving facts materially different from those in the indictment constitutes a "variance." Such a variance becomes a constructive amendment when the evidence at variance with the indictment goes to an essential element of the charged offense. *See Scutchings v. United States*, 509 A.2d 634, 636 (D.C.1986).

for an obstructive act which occurred in Maryland refers to the location of the *effect* of that act).

### J. Sufficiency Evidence Supporting Burglary Count

█ Both at the close of the government's case-in-chief and at the close of trial, appellant moved for a judgment of acquittal, challenging the sufficiency of the evidence supporting his conviction of burglary with intent to commit assault. *See* D.C.Code § 22–1801(a) (1996). Appellant argues that, even viewing the evidence in the light most favorable to the government, no jury could have found appellant guilty beyond a reasonable doubt because no evidence was presented to show that, before forcing his way into the Knights' house, appellant had the specific intent to assault its occupants upon entry. Appellant contends that, because "the assault of Edwin Knight was already in progress when [appellant] entered the house," and because appellant was unaware of whether anyone else was within the house, he could not have intended a new assault upon entering the premises.

█ Appellant concedes that intent to commit assault "is 'rarely capable of direct proof,' and, unless it is admitted by the accused, it typically must be shown by circumstantial evidence." *Lee v. United States*, 699 A.2d 373, 383 (D.C.1997) (quoting *Bowman, supra*, 652 A.2d at 67). "To prove burglary, the government must establish 'that the defendant entered the premises having already formed an intent to commit a crime therein.'" *Id.* at 383 (quoting *Warrick v. United States*, 528 A.2d 438, 442 (D.C.1987)).

The evidence demonstrated that appellant told Simpson and Wiseman he planned to collect on a debt from Edwin Knight and that he suggested the possibility of violence when he told Simpson that "no one would get hurt *if* [Simpson] just did [what] he asked [her] to do." [Emphasis added.] It also showed that appellant went to Knight's house brandishing a gun. These facts provide sufficient circumstantial evidence to support the jury's conclusion that appellant had the requisite intent to commit an assault when he entered the house. *See Lee, supra*, 699 A.2d at 384 (fact that appellant entered house with a weapon, stated intention to have a confrontation, and actually committed assault soon after he was inside the house provide strong circumstantial evidence that he intended to commit an assault upon entering) (citing *Bowman, supra*, 652 A.2d at 68; *McKinnon v. United States*, 644 A.2d 438, 442 (D.C.), *cert. denied*, 513 U.S. 1005, 115 S.Ct. 523, 130 L.Ed.2d 428 (1994)). Therefore, the trial court's denial of appellant's MJOAs was proper.

### Conclusion

Accordingly, the judgment of the trial court is

*Affirmed.*