Kelvin FORD, Appellant,

v.

UNITED STATES, Appellee.

No. 91–CF–351.

District of Columbia Court of Appeals.

Argued Oct. 23, 1992.
Decided Nov. 24, 1992.

Neal L. Thomas, appointed by the court, for appellant.

Edward G. Burley, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Daniel M. Zachem, Asst. U.S. Attys., were on the brief for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Kelvin Ford was convicted by a jury of two counts of assault with intent to kill while armed,[1] one count of possession of a firearm during the commission of a crime of violence,[2] three misdemeanor weapons offenses,[3] and one count of obstruction of justice.[4] On appeal, he presents several contentions, only two of which require plenary consideration. Ford asks us to reverse all of his convictions on the ground that the trial judge erroneously excluded testimony which, in conjunction with other proffered evidence, would have proved an admission by Ford's former codefendant, Andre Armstrong, that Armstrong, and not Ford, was the man who shot the two complainants.[5] Ford also challenges his conviction of obstruction of justice upon the ground that the alleged criminal conduct occurred in Maryland and not in the District of Columbia.

■ We agree with Ford that testimony regarding Armstrong's alleged admission was erroneously excluded, but conclude in light of other defense evidence that the error was harmless. We also hold that the Superior Court has jurisdiction over prosecutions for conduct in Maryland which is designed to bribe witnesses in District of Columbia proceedings and thus to obstruct the administration of justice in the courts of the District of Columbia. Accordingly, we affirm.

I

THE FACTS

This case arises out of the shooting of Gregory Grant and Alexis "Boo" Caston on October 4, 1989, as the two young men[6] sat in a stationary automobile at an intersection in southeast Washington, D.C. Kelvin Ford and Andre Armstrong were arrested and charged with the crime. Armstrong eventually negotiated a plea agreement with the government and testified against Ford at trial.

According to the prosecution's evidence, Grant was the owner of a wrecked Volkswagen Rabbit. Armstrong had a stolen car for which he needed a Vehicle Identification Number (VIN) and title. Grant sold Armstrong the VIN and title, as well as some parts, for $175. Ford, who was then a friend of Armstrong, facilitated the transaction by taking the money from Arm-

---

1. D.C.Code §§ 22–501, –3202 (1989).

2. D.C.Code § 22–3204(b) (1989).

3. These offenses included carrying a pistol without a license, D.C.Code § 22–3204(a) (1989); unlawful possession of an unregistered firearm, D.C.Code § 6–2311(a) (1989), and unlawful possession of ammunition, D.C.Code § 6–2361(3) (1989).

4. D.C.Code § 22–722(a)(3) (1989).

5. The witness who claimed to have heard Armstrong's alleged admission did not know Armstrong and thus could not identify him as the speaker.

6. Caston was only sixteen years old at the time of the shooting.

strong, handing it to Grant, and turning the title and VIN over to Armstrong.

Subsequently, Ford informed Armstrong that Grant had told some residents of the neighborhood about the transaction, and had thus disclosed that Armstrong was driving a stolen car. As a result, Armstrong felt compelled to discard the vehicle for which, at considerable expense, he had obtained the false VIN and title. The disclosures by Grant infuriated Armstrong and Ford, and the two men discussed revenge by annihilation.[7] They then converted their words into deeds.

Armstrong testified that on October 4, 1989, he visited Ford at his home. According to Armstrong, Ford put a .38 caliber revolver in his waistband, and the two men left Ford's home to look for Grant. When they finally observed Grant and Caston in Grant's car, talking to some passersby, they decided to "get" Grant. Armstrong parked his jeep in front of Grant's car. Ford got out of Armstrong's vehicle, walked towards Grant's, drew his revolver, and fired several shots through Grant's windshield. Grant suffered wounds to the face, shoulder and chest; at the time of trial, one bullet remained in the back of his head and a second under his shoulder. Caston ducked, but was struck in the left forearm.

In statements to police at the scene and at the hospital, and consistently thereafter, Grant identified Ford as the man who shot him. Caston initially told prosecutors that Armstrong was the gunman, and he identified Armstrong (but not Ford) at a lineup. At trial, however, he testified that Ford was the shooter, and that he (Caston) had previously lied because Ford had bribed

him to put the blame on Armstrong.[8] According to Caston, Ford offered to pay off his motorcycle and later gave Caston a pistol. Through Renard Kroger, a friend of Ford's who worked with Caston, Ford also provided Caston with photographs of Armstrong, whom Caston did not know, in order to facilitate Caston's proposed false identification of Armstrong as the man who shot him and Grant.[9] It is undisputed that all of the alleged bribery took place in Maryland.

Ford's defense was alibi. Testifying on his own behalf, Ford denied that he had any connection with the shooting or with the obstruction of justice. Ford stated that on the night of the shooting, while he was at home with his friend Gertrina Bradford and his young son, Armstrong had come to his home and had acknowledged to Ford that he (Armstrong) had shot Grant. Ford also presented the testimony of two other witnesses, Robert Staton and David Henderson, who claimed that Armstrong had made similar admissions in their presence. In addition, Ford attempted to adduce testimony from Ms. Bradford that she heard a man whose identity she did not know (but whom Ford identified as Armstrong) make a similar admission. The trial judge, however, excluded testimony about what the declarant said, on the ground that Ms. Bradford was unable to identify him.

## II

### THE RESTRICTION ON MS. BRADFORD'S TESTIMONY

#### A. Procedural Background

Gertrina Bradford testified that she had known Ford for several years because the

---

7. Armstrong's chilling testimony included the following:
 Q. And what did the two of you talk about?
 A. Getting Gregory.
 Q. And when you say getting him, what do you mean by that?
 A. Killing him.
 Q. How did the defendant feel about the fact that Gregory was talking about this stolen car?
 A. Mad.
 Q. And how do you know that?
 A. Because, like I said, we had discussed killing Gregory. We both was upset.

 Q. How did you feel about it?
 A. Mad.
 Q. And how mad were you?
 A. Mad enough to kill him.

8. Caston's account of the bribery was partially corroborated by Caston's co-worker, Renard Kroger.

9. On cross-examination, Caston stated that he no longer had either the pistol or the photographs. He was thus unable to provide any tangible evidence to corroborate his claim.

two of them had been co-workers at the Army Corps of Engineers. She said she and Ford were close friends, although there was no romance between them "as of now."

On the evening of October 4, 1989, according to Ms. Bradford, she was visiting Ford at his apartment. After she had been there for some time, there was a knock on the door. Ms. Bradford stated that she retired to the bedroom in order to enable Ford to entertain the visitor in privacy. Ms. Bradford then heard a man, whose voice she was unable to recognize, speak in a loud voice to Ford. She was about to describe what the man said, but the prosecutor objected. The objection was based solely on the ground that "the witness is not competent to answer that question." The trial judge sustained the objection. Ms. Bradford was thus precluded from describing what she had heard. She did testify, however, that after the two men spoke briefly, the visitor left. She and Ford then watched the television show "City Under Siege" on Channel 5.[10]

On cross-examination, the prosecutor cross-examined Ms. Bradford intensely about how often she had been in Ford's apartment and how she remembered the particular evening. On redirect examination, defense counsel again asked her about the conversation which she had overheard, and the judge again sustained a prosecution objection. At the bench, Ford's counsel argued that

the prosecutor's making it seem like she's made this up and she can't remember this particular day. Well, because Mr. Armstrong, or the other male voice, comes over and says he thought he just killed somebody, that allowed her to remember the day, but it's not coming in for the truth asserted in the statements. It's coming in to show how she remembers that day. That's a truly significant event.

The prosecutor responded in pertinent part that

this statement is being offered for nothing but the truth contained in that statement. He wants the jury to believe that it was Andre Armstrong who made that statement and this witness is simply not competent to testify as to that.

The judge then stated that "the problem is that this witness, herself, cannot testify that Andre Armstrong made this statement." The prosecutor's objection and the judge's ruling were thus based entirely on Ms. Bradford's inability to identify Armstrong, and not at all on any contention that her proposed testimony was hearsay.[11]

In light of the judge's ruling, defense counsel offered at the bench to connect up the testimony by calling Ford to identify his visitor and by then re-calling Ms. Bradford. A prolonged colloquy ensued and concluded as follows:

THE COURT: See, that is—she can't say that Andre Armstrong said anything—

MR. WOOD [defense counsel]: She can say, somebody.

THE COURT: —because she didn't recognize his voice.

MR. WOOD: Someone came in and said they just killed someone. He says that person.

THE COURT: See, that is the problem, Mr. Wood. I cannot let her testify as to what someone said, only Mr. Armstrong—

MR WOOD: But if Mr. Ford fits it in.

THE COURT: Then he has to testify to it.

MR. WOOD: That's right, and he's prepared to.

THE COURT: But not her.

MR. WOOD: And then I'll call her back.

THE COURT: No, you won't. Okay.

MR. ZACHEM [prosecutor]: Thank you, Your Honor.

**10.** According to Ford, Armstrong had indicated that news of the shooting would be on this particular program.

**11.** Subsequently, when Staton and Henderson each testified that Armstrong had admitted that he had shot Grant, the prosecutor raised no hearsay or other objection, and the testimony was routinely admitted.

## IN OPEN COURT

THE COURT: Objection to the question will be sustained.

In spite of defense counsel's proffer that Ms. Bradford had heard someone other than Ford admit shooting Grant, and despite his representation that Ford could "connect up" the testimony and identify the speaker, the witness was never permitted to describe Armstrong's alleged admission to the jury.

### B. Legal Analysis.

A criminal defendant's right to call witnesses on his own behalf and to present exculpatory evidence is basic to our system of jurisprudence. *Martin v. United States*, 606 A.2d 120, 127 (D.C.1991) (citations omitted). Testimony tending to show that someone other than the accused committed the crime, and that the accused did not, is quintessentially exculpatory. *Id.* at 127–29.

> There is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense. Rather, the evidence need only *tend to* create a reasonable doubt that the defendant committed the offense. In this regard, our focus is on the effect the evidence has upon the defendant's culpability, and *not* the third party's culpability.

*Johnson v. United States*, 552 A.2d 513, 517 (D.C.1989) (citations omitted) (emphasis in original). *See also* 1A JOHN HENRY WIGMORE, EVIDENCE, § 139, at 1724 (Tillers rev. ed. 1983):

> [I]t is not a question of absolute proof, nor even of strong probability, but only of raising a reasonable doubt about A's commission [of the offense], and for this purpose the slightest likelihood of B's commission may suffice or at least assist. . . .

The government contends in its brief in this court that the proffered evidence was hearsay, and that Ford's attorney failed to invoke an applicable exception to the hearsay rule. *Cf. Laumer v. United States*, 409 A.2d 190, 199 (D.C.1979) (en banc) (addressing admissibility of declarations against penal interest). No hearsay objection was offered at trial, however; indeed, the prosecutor subsequently presented no challenge at all to the reception in evidence of other testimony regarding Armstrong's alleged admissions that he shot Grant. The issue of hearsay never having been raised, it was not incumbent upon the proponent of the evidence to anticipate an objection based upon that doctrine.

Rather, the prosecution's sole ground for objection, and the judge's sole basis for excluding the testimony, was that Ms. Bradford was unable to identify the speaker who allegedly made the admission. The challenge, in other words, was based exclusively on Ms. Bradford's *competence* to testify to the proffered facts. The trial judge sustained that challenge in spite of defense counsel's proffered readiness to "connect up" Ms. Bradford's testimony by calling Ford to identify the speaker (which Ford in fact subsequently did).

Even in the absence of counsel's proffered "connecting up," Ms. Bradford's testimony was arguably admissible. Evidence that an unidentified individual committed the crime might reasonably be viewed as relevant to the issue whether a reasonable doubt existed as to Ford's guilt. *Johnson, supra*, 552 A.2d at 517; 1A WIGMORE, *supra*, § 139, at 1724. We need not decide that question, however, for Ms. Bradford's testimony was at least conditionally relevant when first proffered. *See, e.g., Gerber v. Columbia Palace Corp.*, 183 A.2d 398, 400 (D.C.1962); EDWARD W. CLEARY, MCCORMICK ON EVIDENCE, § 58, at 149–51 (1984).[12] When Ford testified that he was

---

12. As the Supreme Court of the District of Columbia explained more than a century ago,

> it is expedient, and oftentimes necessary, that evidence, not apparently admissible, shall be allowed to be given to the jury, subject to the control of the court, in afterwards rejecting or modifying it, with proper instruction, with reference to that particular state of circumstances.

*Rich v. Henry*, 15 D.C. (4 Mackey) 155, 161 (1889).

present and that Armstrong was the speaker, Ms. Bradford's description of what the speaker said was "connected up," and any defect based on lack of competency was cured. "[O]nce the parties to a . . . conversation have been properly identified by one witness, no further identification is required by an [individual] who merely corroborates the prior testimony as to the substance of the conversation." *Commonwealth v. Sullivan*, 436 Pa. 450, 455, 263 A.2d 734, 737 (1970).

Often, as in this case, "only one fact can be proven at a time by a given witness." McCormick, *supra*, § 58, at 149. "[T]he everyday method of handling the situation when the adversary objects to the relevancy or the competency of the offered fact is to permit it to come in conditionally, upon the assurance, express or implied, of the offering counsel that he will 'connect up' the tendered evidence by proving, in the later progress of his case, the missing facts." *Id.* Alternatively, the judge could have required Ford to establish Armstrong's identity through Ford's own testimony before admitting Ms. Bradford's description of what the speaker (who would by then have been identified as Armstrong) said to Ford on the night of the shooting. It was error, however, to sustain a competency objection and to exclude such potentially exculpatory testimony altogether.

## C. Harmless Error Analysis.

 Tacitly acknowledging the vulnerability, on the merits, of the trial judge's ruling on the admissibility of Ms. Bradford's proffered testimony, the government places most of its eggs in the "harmless error" basket. Noting that Ford testified about the content of his alleged conversation with Armstrong on the evening in question, and that Ms. Bradford corroborated his version with respect to everything except what Armstrong said, the government argues that Ford

was not denied the opportunity to present his version of the events on the night of the shooting, and had the benefit of a

corroborating witness. Thus the exclusion of the overheard conversation, if error, was clearly [13] harmless.

Ford responds that the government's argument

ignores the fact that testimony from a nonparty, disinterested witness is far more persuasive to a jury than testimony from a criminal defendant who may, in the eyes of the jury, be less likely to testify truthfully.

 To warrant a holding that trial court error is harmless, the court must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Clark v. United States*, 593 A.2d 186, 192 (D.C.1991) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). In our analysis of a claim of harmlessness, we look to the closeness of the case, the centrality of the error, and any steps taken to mitigate the effects of the error. *Gaitber v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969); *Clark, supra*, 593 A.2d at 193.

It is never easy to assess closeness from our "sheltered appellate perch," for we are in no position to assess the demeanor or credibility of the witnesses. *Clark, supra*, 593 A.2d at 193. Subject to that caveat, however, the prosecution's case against Ford was a formidable one. Grant, the more seriously wounded of the victims of the shooting, knew Ford and consistently identified him as his assailant. The first identification occurred on the scene. Caston, the other complainant, also identified Ford at trial, although he had previously failed to do so, allegedly on account of Ford's attempts to bribe him. Armstrong, who acknowledged his own participation in the planning of an attempt to assassinate Grant, corroborated the accounts provided by Grant and Caston, including the identification of Ford as the shooter. Two witnesses testified that Ford attempted to thwart the case against him through brib-

---

**13.** Like beauty, clarity is often in the eye of the beholder. We do not view as at all one-sided the issue whether the trial judge's error was harmless.

ery, the kind of conduct which is compelling evidence of consciousness of guilt. II WIGMORE, *supra* § 278, at 133, *quoted in Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991). Although less than benign motivations might be attributed to some of the prosecution witnesses, especially to Armstrong,[14] an impartial jury might have difficulty in believing that all of these individuals set out to pin the crime on someone who, by his own account, had absolutely nothing to do with it.

Applying the second prong of the *Gaither* test, we think that the issue which Ms. Bradford was ready to address—an admission by Armstrong that he was the man who shot the victims—goes to the central issue in the case. By all accounts, only one man did the shooting. Any admission by Armstrong that he was that man made it less likely that Ford did it. "[The] principle which states that an average person will not acknowledge the existence of a fact that is counter to his interest unless he knows it to be true [applies], as a matter of logic, [to] declarations against penal interest ... as well as [to] ... statements against pecuniary or proprietary interest." *Laumer, supra,* 409 A.2d at 196 (holding declarations against penal interest admissible where certain conditions are met).

There was, however, substantial other evidence which alleviated any prejudice to Ford. Three witnesses were permitted to testify, and in fact testified, that Armstrong had admitted shooting Grant. Ford's own account to the jury of Armstrong's remarks on the night of the shooting was corroborated, in circumstance though not in content, by the portion of Ms. Bradford's story which the jurors were allowed to hear. If the testimony of three defense witnesses that Armstrong had admitted being the shooter did not persuade the jury that there was a reasonable doubt of Ford's guilt, we think it most unlikely

that similar testimony by a fourth person would have done so, especially where that fourth person was as close to Ford as Ms. Bradford was. Accordingly, we think it "highly probable that the error did not contribute to the verdict." *Mills, supra,* 599 A.2d at 192 (citation omitted).

### III

### THE JURISDICTIONAL ISSUE REGARDING THE OBSTRUCTION OF JUSTICE COUNT

With exceptions not here applicable, "the Superior Court has jurisdiction of any criminal case under any law applicable exclusively to the District of Columbia." D.C.Code § 11–923(b) (1989). Section 22–722(a) of the District of Columbia Code (1989) provides in pertinent part as follows:

A person commits the offense of obstruction of justice if that person:

. . . .

(3) Willfully endeavors by means of bribery, misrepresentation, intimidation, or force or threats of force, to obstruct, delay, or prevent the communication to an investigator of the District of Columbia by any person of information relating to a violation of any criminal statute in effect in the District of Columbia.

Noting that the indictment charged him with bribery and like conduct *"within the District of Columbia"* for the purpose of obstructing justice, Ford contends that all of his alleged activities relating to this count occurred in Maryland. He claims that in light of the foregoing statutory framework and case law on which he relies, *see, e.g., Goodloe v. United States,* 88 U.S.App.D.C. 102, 188 F.2d 621 (1950), *cert. denied,* 342 U.S. 819, 72 S.Ct. 35, 96 L.Ed. 619 (1951); and *United States v. Swann,* 142 U.S.App.D.C. 363, 441 F.2d 1053 (1971),

---

**14.** There was also appreciable evidence that it was Armstrong who fired the shots. He had the prime motive to do so, for Grant was describing him, rather than Ford, as the user of stolen car, and it was he who had to get rid of the vehicle. *See Martin, supra,* 606 A.2d at 128 (discussing probative value of evidence of motive). Moreover, four persons—Staton, Henderson, Ms.

Bradford and Ford—testified, or were ready to testify that Armstrong had admitted shooting Grant; a fifth person, Kroger, initially gave a similar account. Any hypothetical case against Armstrong as the shooter is undercut, however, by Grant's immediate report to the police, from which he never wavered, that it was "Kelvin" who shot him.

the Superior Court was without jurisdiction to try him.

This court has never previously decided the jurisdictional issue raised by Ford. In *Pennington v. State*, 308 Md. 727, 521 A.2d 1216 (1987), however, the Court of Appeals of Maryland sustained a Maryland prosecution for conduct in the District which potentially obstructed justice in Maryland—the mirror image of the present case, except that the roles of the two jurisdictions were reversed.

Jean Pennington had stabbed Susannah Sennett in the District of Columbia in order to dissuade Ms. Sennett from testifying in an assault case then pending in Baltimore, Maryland. She was convicted in a Maryland court of obstruction of justice. Ms. Pennington contended on appeal that since the assault was perpetrated in the District, the Maryland courts were without jurisdiction to try her. The Maryland obstruction of justice statute, Md.Code Art. 27 § 27 (1982), which is quoted in *Pennington*, 308 Md. at 733, 521 A.2d at 1219, was similar in pertinent respects to its District counterpart.

The court, in a scholarly opinion by Judge Smith, unanimously affirmed Ms. Pennington's conviction. Quoting 1 WHARTON'S CRIMINAL LAW § 14, at 69 (C. Torcia 14th ed. 1978),[15] the court applied "[t]he well-established theory of the law that where one puts in force an agency for the commission of crime, he in legal contemplation accompanies the same to the point where it becomes effectual." *Id.* at 732, 521 A.2d at 1218. The court also quoted

from Justice Holmes' opinion for the Supreme Court in *Strassheim v. Daly*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911):

> Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power.

308 Md. at 737, 521 A.2d at 1221. Viewing the "gravamen" of the offense of obstruction of justice as being "the intended result in Maryland," the court held that the proper "situs of the crime is the place of the judicial proceeding that the accused sought to thwart." *Id.* at 733, 521 A.2d at 1219 (citations and internal quotation marks omitted).

We agree entirely with the opinion of the Court of Appeals of Maryland,[16] of which only a small portion is summarized here. We note that the basic thrust of *Pennington* is consistent with District of Columbia authority which is somewhat analogous, albeit imperfectly so. In *United States v. Baish*, 460 A.2d 38 (D.C.1983), for example, this court upheld the conviction of a defendant for telephoned threats to do bodily harm, even though the prosecution had failed to prove that the call originated in the District.[17] Similarly, in *Hunter v. United States*, 48 App.D.C. 19 (1918), the court upheld a criminal contempt conviction based upon the defendant's violation of the order of a District of Columbia judge, even though the acts constituting the violation occurred entirely in Maryland.[18]

---

15. The quotation from WHARTON was in turn taken from *Simpson v. State*, 92 Ga. 41, 43, 17 S.E. 984, 985 (1893).

16. We have recently reiterated that, for historical reasons, decisions of that court are generally accorded especially great respect by the courts of this jurisdiction. *Roberts-Douglas v. Meares*, 615 A.2d 1114 (D.C.1992). We follow the *Pennington* decision, however, primarily because of the persuasive force of its reasoning.

17. We stated in *Baish* that

> [t]he making of a threat entails three stages: utterance, transmittal, and communication. Once the crime of making threats is complete,

the defendant may be prosecuted in any jurisdiction where one or more steps occurred. 460 A.2d at 41 (citation omitted).

18. The court said:

> The fact that the offense was committed at a point remote from the court, in an adjoining State, is of no importance. "The question is not one of geography or topography, or propinquity or remoteness, but one of direct influence upon the administration of justice. The administration of justice is equally obstructed wherever the act is done; and the place of the solicitation is absolutely of no consequence whatever. Whether the act was done in the courthouse, or a mile or 100 miles away, the result is precisely the same: the

The authorities on which Ford relies are of no solace to him. In *Goodloe, supra,* a federal prosecution, the defendant, an abortionist, attempted to bribe a witness who was scheduled to appear before a federal grand jury. He contended that the trial judge should have granted his motion for judgment of acquittal because the bribery occurred in Maryland. The court rejected his contention, noting that Goodloe and his codefendant had made telephone calls from the District and had travelled from the District to Baltimore to effectuate the attempted bribe. The court stated that Goodloe's "point is not well taken if the evidence showed that the attempt to bribe was commenced, continued, or completed here, even though most of the acts relied upon to constitute the crime were committed in Baltimore." *Id.,* 88 U.S.App.D.C. at 103, 188 F.2d at 622.

*Goodloe,* however, was essentially a venue case. The basic issue was whether this federal prosecution was correctly brought in the United States District Court in the District of Columbia, rather than in the United States District Court for the District of Maryland. The federal prosecutive interest could have been redeemed in either venue. In the case now before us, on the other hand, Ford's conduct was intended to interfere with the integrity of the judicial process in the District of Columbia. The only logical situs for a prosecution designed to vindicate the District's interest is in the District's courts. It would be unreasonable to make the opportunity for such vindication contingent upon whether Maryland has elected—and Maryland has not—[19] to punish activities in that State which are designed to obstruct District of Columbia justice.

Like *Goodloe,* the decision in *Swann, supra,* which Ford describes as "factually on all fours" with the instant case, actually arose from a federal prosecution in the United States District Court for the District of Columbia. Swann was charged with attempting to intimidate Pauline Hawkins, who had previously testified at a preliminary hearing in a rape case against him, by shooting her with a pistol. Swann moved to dismiss the indictment for improper venue. The court held that the offense charged had been completed in Maryland, and that venue in the federal court in this District was therefore improper. In *Swann,* as in *Goodloe,* however, the federal prosecutive interest could be vindicated in either of two United States District Courts. In the present case, on the other hand, only a District of Columbia prosecution could redeem the District's interest in the integrity of its judicial process.[20]

Moreover, *Swann* was decided on February 17, 1971. Decisions of the United States Court of Appeals after February 1, 1971, the effective date of court reorganization, are not binding on this court. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971). Accordingly, even if *Swann* had presented the question which we must decide here, which it did not, we would not be required to follow it. We note, in that connection, the holdings of an overwhelming majority of federal courts that a prosecution under 18 U.S.C. § 1503, for obstruction of justice, "may be brought in the district where the judicial proceeding that the accused sought to obstruct is pending, even if the obstructing acts took place in a

---

disturbance to the court is precisely the same. The act in its nature is not dependent upon location for its greater or less influence on the administration of justice." *McCaully v. United States,* 25 App.D.C. 404, 413 (1905). *Hunter, supra,* 48 App.D.C. at 24–25.

19. The Maryland obstruction of justice statute proscribes certain obstructive acts against "any juror, witness or court officer of any court of *this State"* or endeavors or acts "to obstruct or impede the due administration of justice *therein."* Md. Crimes and Punishment Code Ann. art. 27, § 27 (1992) (emphasis added).

20. Ford also relies on *United States v. Guiteau,* 12 D.C. (1 Mackey) 498 (1882). Guiteau shot President Garfield in the District of Columbia. The president later died in New Jersey. The Supreme Court of the District of Columbia rejected Guiteau's contention that a criminal court in the District lacked jurisdiction to try him. The issues in *Guiteau* bear no resemblance to those presented here, and the protection of the integrity of the courts of this jurisdiction was not implicated.

different district." *United States v. Frederick,* 835 F.2d 1211, 1213–14 (7th Cir. 1987), and authorities there cited, *id.* at 1214.

IV

CONCLUSION

For the foregoing reasons, Ford's convictions must be and each is hereby

*Affirmed.*[21]

**21.** We dispose summarily of Ford's remaining contentions. Substantially for the reasons stated in the government's brief, the disclosure to the jury of Armstrong's plea agreement, including the requirement therein that he testify truthfully, did not constitute improper prosecutorial vouching for Armstrong's veracity. *See, e.g., Felder v. United States,* 595 A.2d 974, 979 (D.C. 1991). The government no more "vouched" for Armstrong's credibility by revealing the language in the plea agreement than it did when it called Armstrong as a prosecution witness. Moreover, we have considerable difficulty with the proposition that such supposed "vouching" would have substantially swayed an impartial jury where the witness in question had already been introduced by the prosecutor and had sworn in the presence of the jury to tell the truth. *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248.

We likewise conclude that the trial judge did not abuse his discretion by admitting into evidence, over Ford's objection, Grant's bloodstained clothing. *Dixon v. United States,* 565 A.2d 72, 76 (D.C.1989). Moreover, even if admission of the clothing had been erroneous, which it was not, any error under these circumstances was harmless.