**Michael SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 09–CF–410.

District of Columbia Court of Appeals.

Argued Jan. 6, 2011.

Decided Sept. 8, 2011.

James Whitehead, Public Defender Service, with whom James Klein, Samia Fam, and Corinne Beckwith, were on the brief, for appellant.

Elizabeth Gabriel, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney and Roy McLeese III, Elizabeth Trosman, and Ephraim Wernick, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, REID,[*] Associate Judge, Retired, and SCHWELB, Senior Judge.

REID, Associate Judge, Retired:

Appellant, Michael Smith, appeals his conviction for carrying a pistol without a license ("CPWL"), possession of an unregistered firearm, unlawful possession of ammunition, and unlawful possession of a firearm.[1] He asserts that the trial court committed "reversible error" in excluding his expert testimony on relevancy grounds, and that the court violated his Sixth Amendment right to present a defense. For the reasons stated below, we are constrained to reverse the trial court's judgment and remand this case for a new trial.

## FACTUAL SUMMARY

The government presented evidence showing that on May 2, 2008, Metropolitan Police Department ("MPD") Officers Dioni Fernandez, Thomas Sheehan, and Matthew Jones responded to a "radio run" for a six foot tall black male with a gun, wearing jeans and a white t-shirt and located in an apartment complex in the 6600 block of Georgia Avenue, in the Northwest quadrant of the District. Officer Fernandez entered the apartment complex first, with Officers Sheehan and Jones following immediately behind him. Upon entry, Officer Fernandez saw Mr. Smith amidst a group of five or six people. He was holding, perhaps sitting on or straddling, a bicycle. Mr. Smith was the only person in the group who matched the description given on the radio run, and upon seeing the officers, he dropped the bike and began walking away "at a fast pace" while

holding his waistband. He ignored Officer Fernandez's initial "commands to show his hands."

Officer Sheehan saw Mr. Smith "walking briskly . . ., with his hand in his waistband[,] . . . looking over his shoulder." He ordered him to stop approximately five times, and then he stopped Mr. Smith and searched him, but the search produced no weapons. Officer Fernandez returned to the bike that he saw Mr. Smith holding and found "a pouch underneath the seat." He touched the pouch, felt what he believed was a gun, unzipped the pouch, and saw a gun handle. Officer Fernandez informed Officer Sheehan about the gun. Officer Sheehan transported Mr. Smith "off the scene." Officer Fernandez rode the bike, with the gun zipped in the pouch, to the nearby Fourth District police station for processing.

Officer Holly Paige of MPD's Crime Scene section, Forensic Science Division, used an ultraviolet blue powder[2] to process the gun for fingerprints on the night of May 2, 2008. The test revealed one fingerprint. Officer Paige was unable to process the bike for fingerprints because Officer Fernandez contaminated it when he rode it to the police station. Officer Paige swabbed the gun for DNA, but never sent the swab for processing because the procedure was costly. MPD fingerprint specialist Barbara Evans also testified as an expert witness in "the examination of latent prints." In her thirty-six years with the FBI and MPD, she examined "at least 10,000 or more" latent fingerprints. Ms. Evans examined the fingerprint that Officer Paige recovered and stated that it was not usable because it did not contain enough identifiable points or

[*] Judge Reid was an Associate Judge of the court at the time of argument. Her status changed to Associate Judge, Retired, on April 7, 2011.

1. D.C.Code §§ 22–4504(a), 7–2502.01, 7–2506.01(3), and 22–4503(a)(2).

2. This process also was referred to as "Ultra Blue 2000 paint powder."

characteristics to be successfully matched to, or exclude, Mr. Smith. Officer Paige testified that in her experience only five to ten percent of fingerprints recovered from guns are usable.

During cross-examination, Officer Paige admitted that the District of Columbia's MPD had issued a Special Order[3] requiring officers to use the Superglue[4] fuming method to recover latent fingerprints from guns that were not found on the defendant's person.[5] She was asked whether the Special Order stated that: "Where a firearm is not found on the defendant's person, the CSSO ... shall ... us[e] the [S]uperglue method (unless the Forensic Sciences Lab personnel determine that another method would have a better likelihood of success because of the surface involved)."[6] Officer Paige responded: "Correct." She acknowledged that the MPD had Superglue available as well as "mobile units that can come to the case to perform Super[g]lue fuming." On re-direct, Officer Paige stated that she preferred to use the powder method.

Mr. Smith intended to call his own fingerprint expert, Mr. Wynn, to rebut Officer Paige's and Ms. Evans's testimony. On August 19, 2008, the defense provided notice to the government of its intent to call Mr. Wynn "as an expert in the lifting, analysis, and comparison of fingerprints." The government made an oral motion to exclude Mr. Wynn's testimony. Mr. Smith's written Opposition to the government's motion indicated, in part, that:

> Mr. Wynn would testify that [S]uperglue fuming is a superior method to the powder method used in this case by the Crime Scene Search Officer (CSSO). The fact that the police did not use a method available to them is an argument that the jury should acquit based on the government's lack of evidence. Further, to the extent the government presented the CSSO as a trained professional who did her [investigation] adequately and sufficiently, the defense is entitled to be able to put Mr. Wynn on to rebut that inference that the CSSO is a witness who the factfinder can credit and believe that she did her job adequately. Mr. Wynn would allow Mr. Smith to argue by way of substantive, affirmative evidence that the CSSO's work is a reason to doubt the government's case.

In addition, the Opposition stated:

> Mr. Wynn would testify that the choice of the powder method utilized in this

---

3. MPD Special Order, SO–03–04, *Intake Guidelines for Firearms Cases*, June 11, 2003 ("Special Order").

4. "Superglue" also appears in the literature as "Super Glue" or "Super glue."

5. Officer Paige acknowledged that the Superglue method "could be use[d] to try to lift latent fingerprints." She stated that "[n]ormally, [she] submit[s] a weapon when there's not a defendant." She "submit[s] it to the Crime Scene Search lab, and they do all the chemical processing," but the Superglue process takes longer.

6. Later in May 2008, MPD issued a teletype giving technicians the discretion to use the powder or Superglue method to lift finger-prints from a gun. The teletype stated in part:

> This teletype is a reminder of Special Order 03–04 (Intake Guidelines for Firearms Cases) that a CSES/CSSS technician shall respond to the scene of all firearms recovered by members of the Metropolitan Police Department.
> Based on the circumstances surrounding the recovery of a firearm, the CSES/CSSS technician shall determine which method shall be used to process the firearm for fingerprints (i.e. fingerprint powder, super glue).

TT–05–037–08, May 12, 2008, rescinding TT–05–030–08, May 9, 2008. TT–05–037–08 is identical to TT–05–030–08, except for two paragraphs (that are not set forth above) relating to firearm arrests and search warrants.

case decreased the likelihood of recovering a latent print that would be of value to either build a case of conviction against Mr. Smith or to exclude him as having left a print. Mr. Wynn would also testify about recovery rates of latent prints on different porous surfaces, particularly guns. Mr. Wynn would also testify as to the likelihood of recovering a latent print from a bicycle using the [S]uperglue fuming method and other techniques.

Mr. Smith's Opposition further emphasized that "[t]estimony about the methods used by the [MPD] and the methods they had available [would] go[ ] to the quality of the police investigation[,]" and would be "relevant to the contested issue of whether Mr. Smith possessed a gun." [*Id.*] He also stressed that Mr. Wynn would address areas about which Ms. Paige and Ms. Evans testified:

> Further, and importantly, these areas: recovery rates, comparison of latent fingerprints for both inclusion and exclusion purposes, and recovery of fingerprints from certain surfaces, the dusting of a bike for fingerprints were all areas of testimony by the [g]overnment's witnesses.... Mr. Smith now simply seeks to put on his own expert in his defense in these and related areas.

The government objected to Mr. Wynn's testimony "on relevancy grounds" and stated that it would be cumulative. The prosecutor argued that Mr. Smith was able to elicit all of Mr. Wynn's proffered testimony during his cross-examination of Officer Paige and Ms. Evans.

The parties and the trial court discussed the issue of Mr. Wynn's testimony. The trial judge indicated that he needed to do "additional research" before deciding whether to allow Mr. Wynn's testimony. The following day, the trial court relied on *Jackson v. United States,* 768 A.2d 580

(D.C.2001), to exclude Mr. Wynn's testimony as irrelevant and unhelpful in aiding the jury "in determining any issue in this case." The trial court concluded that (1) Mr. Wynn's testimony was irrelevant because the fact that the fingerprint was useless was undisputed; (2) Mr. Wynn's testimony would not aid the jury in determining any of the issues in dispute; (3) Mr. Smith was able to establish his theory of defense sufficiently through cross-examination, and thus; (4) there was nothing Mr. Wynn's testimony would add to Mr. Smith's case or to "the defense theory of the case" or to any matter that was "outside of a juror's ability to understand and hear this case." In sum, the trial court reiterated that: "there [was] nothing [Mr. Wynn] could add, with respect to what has been placed on the record, and with respect to the defense theory of the case, that would assist the jury."

Defense counsel took issue with the trial court, stating in part:

> Mr. W[y]nn would add substantial testimony, with respect to the very things that the Government's witnesses testified about. Ms. Evans was asked about exclusion, dissimilarity, if there's a usable print.
>
> Mr. W[y]nn would be able to amplify that answer, and we want to present affirmative evidence, the Sixth Amendment, with respect to one point of dissimilarity being able to exclude the person.
>
> She talked about patterns, and didn't give a straight—didn't give an answer that Mr. W[y]nn will give, with respect to that point. That makes Mr. W[y]nn's testimony relevant to Ms. Evans's testimony.
>
> . . . .
>
> What is relevant, Your Honor, for reasonable doubt, the defense theory has

been lack of investigative efforts, lack of work. I'm not maintaining that the print that was going to be found would exclude Mr. Smith or be dissimilar. It may even convict him. And Mr. W[y]nn would testify that if a usable print were found, it may be matched to him.

. . . .

And, here, in this case, the jury is going to have no idea what Super[g]lue fuming is.

. . . .

He will testify that had proper methods been used, [the print] may have had value.

. . . .

Well, the—the issue of the case is the investigative work by the police. His testimony will help inform the jury, with respect to both the investigation and quality and quantity of the work they did, and the lack of quality and quantity. Mr. W[y]nn is familiar with MPD protocols, familiar with their resources, and he can speak to what they could have done. He's walking reasonable doubt, if I'm allowed to put him there.

The trial court was unpersuaded and said to defense counsel:

[J]ust as the [c]ourt pointed out in the *Jackson* case, you've put that issue before the jury by cross-examining the Crime Scene Search officer, by cross-examining Officer Fernandez about the responsibilities that are set forth in the Metropolitan Police Department general orders, with respect to maintaining and protecting the integrity of evidence. You've put that before the jury. You could make that argument. You've got facts upon—in the record, from which

you can legitimately make that argument. I don't see that Mr. W[y]nn's testimony is going to aid the trier of fact, in any way. And, indeed, actually, I think it's going to confuse the jury, more than anything else.

## ANALYSIS

Mr. Smith argues that, by excluding Mr. Wynn's testimony as irrelevant, the trial court abused its discretion and violated his Sixth Amendment right to present a defense. He contends that "[t]he trial court's misapplication of *Jackson* and subsequent exclusion of [Mr.] Wynn['s testimony] violated [his] constitutional rights to due process and to an opportunity to present a complete defense, as well as the rules of evidence." He claims that *Jackson* supports his argument that Mr. Wynn's testimony was relevant.[7] He states that the government impermissibly "benefitted from the testimony," particularly Ms. Evans's statement that the fingerprint was "insufficient for all comparison purposes, including for the purpose of attempting to exclude [Mr. Smith] from the print," and Officer Paige's testimony that only five to ten percent of fingerprints retrieved from guns are usable. He maintains that the probative value of Mr. Wynn's testimony outweighed any prejudice that the government might assert.

Furthermore, Mr. Smith asserts that the trial court excluded evidence relevant to his defense. He points to the government's closing argument, during which the prosecutor stated that the sole reason for calling Officer Paige and Ms. Evans as witnesses was to prove that a lack of fingerprint evidence was an unreasonable basis for finding Mr. Smith not guilty. He

---

**7.** In *Jackson,* a drug possession case, we held that expert testimony regarding the feasibility of recovering fingerprints from ziplock bags was relevant to the issue of reasonable doubt where a government witness testified to the futility of processing plastic bags for fingerprints. *Jackson, supra,* 768 A.2d at 590.

maintains that he had no opportunity to refute the government's statement with testimony from his own expert.[8] Mr. Smith also argues that because the government's case against him was weak, Officer Paige's and Ms. Evans's testimony "was critical to bolstering the government's thin case against [him]," and that "[w]ithout defense testimony challenging the police officers' assertions, the government unfairly benefitted from the unimpeached testimony that the police officers did all that they could to find the true owner of the gun."

The government argues that the trial court did not abuse its discretion in excluding Mr. Wynn's testimony and that, even assuming error, it was harmless. It maintains that Mr. Wynn's testimony would not have aided the jurors, only confused them, and that Mr. Smith had ample opportunity to present his defense through cross-examination. It contends that "there was no evidence to suggest that had the Super[g]lue method been used, a print of value would have been recovered." And "even if Mr. Wynn could have demonstrated that the Super[g]lue method generally produced a higher rate of recovery . . . to suggest that the result would have been any different in this case [had the Superglue method been used] would have encouraged the jury to speculate on theoretical possibilities rather than decide the case based on the evidence actually before it." Finally, the government argues that even if Mr. Wynn's testimony was relevant to Mr. Smith's "lack of investigation" theory, it was nevertheless inadmissible because

its probative value was outweighed by its potential prejudicial effect.[9]

■■■ The decision to admit or exclude expert testimony is within the trial court's sound discretion. *Dyas v. United States,* 376 A.2d 827, 831 (D.C.1977). However, " 'the discretion generally vested in the trial court with respect to the admissibility of evidence must be weighed against the constitutional rights of the defendant to confront witnesses and to present a defense.' " *Clark v. United States,* 639 A.2d 76, 81 (D.C.1993) (quoting *Bassil v. United States,* 517 A.2d 714, 716 (D.C.1986) (citation omitted)); *accord, Russell v. United States,* 17 A.3d 581, 585 (D.C.2011) (citing *Howard v. United States,* 656 A.2d 1106, 1117 (D.C.1995) (other citations omitted)). Generally, expert testimony should be admitted if it is relevant and "likely to aid the trier of fact in the search for the truth." *Dyas,* 376 A.2d at 831. "Evidence is relevant if it makes the determination of [an] action more or less probable than it would be without that evidence." *Dockery v. United States,* 746 A.2d 303, 306 (D.C. 2000). "[T]he decision to exclude expert evidence must be made on a case-by-case basis, grounded on the proffer made and on its potential to assist the jury in the particular case before the court." *Benn v. United States,* 978 A.2d 1257, 1273 (D.C. 2009) (citing *Green v. United States,* 718 A.2d 1042, 1051 (D.C.1998)).

■■■ We have long followed the test articulated in *Dyas, supra,* for the admission or exclusion of expert testimony:

8. During his rebuttal argument the prosecutor stated, in part:

    If you need a print to match to the defendant, then in ninety-nine cases out of a hundred, you're going to find not guilty. That's unreasonable doubt. That's—that's the only reason I brought those people [Of-

ficer Paige and Ms. Evans] here to talk to you.

9. The government does not actually state what about the testimony was prejudicial to its case, only that the trial court's determination that it would not appreciably aid the jury is correct.

(1) the subject matter must be so distinctively related to some science, profession, business or occupation *as to be beyond the ken of the average layman;* (2) the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth;* and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.

*Id.* at 832 (quoting McCormick on Evidence, § 13 at 29–31 (E.Cleary, 2d ed.1972)) (internal quotation marks omitted) (alteration in original). Moreover, consistent with the *Dyas* test, we have held that expert testimony concerning the feasibility of recovering fingerprint evidence can be relevant to a defendant's defense theory. *Jackson, supra,* 768 A.2d at 590 (exclusion of testimony was error "because Jackson's defense was that his wrongful arrest stemmed from the officers' neglect ... of their duty to gather available fingerprint evidence"). "[T]he relevance of [fingerprint expert] testimony to that defense [i]s heightened" once the government has presented evidence on the futility of gathering fingerprint evidence. *Jackson,* 768 A.2d at 590.

■ Whether trial court evidentiary error in admitting or denying expert opinion testimony is harmless is governed in this case by the non-constitutional standard announced in *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Reversal may or may not be required under the *Kotteakos* standard:

If, when all is said and done, the conviction is sure that the error did not

influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected....

*Id.* at 764–65, 66 S.Ct. 1239 (citation and footnote omitted); *see also Russell, supra,* 17 A.3d at 589 [ (citing *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239) ] (we cannot say " 'with fair assurance ... that the judgment was not substantially swayed by the error' ").

■ We believe that Mr. Smith has the better of the arguments in this particular case. Here, Mr. Smith sought to present testimony from Mr. Wynn, a fingerprint expert with thirty-five years experience who had testified "numerous times" in the trial court and who was familiar with "MPD methods, resources, and protocols." Counsel for Mr. Smith explained in writing and orally during trial on February 5, 2009, that Mr. Wynn's testimony was relevant because it addressed whether "the government has met its burden of proof beyond a reasonable doubt"; and that he would provide testimony concerning the quality and adequacy of the government's investigation and the superiority of the available Superglue fuming method in lifting fingerprints.[10]

Mr. Wynn's proffered testimony concerned the success rate of lifting usable prints off of guns when utilizing the Superglue method. According to Mr. Wynn's

**10.** For information on the Superglue fuming method, *see, for example,* Mark Kollar, *Superglue Fuming Doorknobs,* 8 Evidence Technolo-gy Magazine 16 (2010); *Superglue Fuming,* http://www.enotes.com/forensic-science/superglue-fuming.

proffered testimony, closer to fifty percent of usable fingerprints are recovered when utilizing Superglue fuming, which contradicted Officer Paige's five to ten percent statistic. In addition, Mr. Wynn would have testified that (1) the Superglue method could have yielded fingerprints off of the contaminated bike, which Officer Paige stated was not possible; and (2) a defendant may be excluded with less than the eight identifiable characteristics that Ms. Evans testified were necessary for exclusion. As such, Mr. Wynn's testimony was directly relevant to the defense theory that the police investigation was deficient in that Ms. Paige did not use the superior Superglue method that was available.[11] Furthermore, Mr. Wynn's testimony was relevant to assist the jury in determining whether a reasonable doubt existed as to whether Mr. Smith possessed the gun found in the pouch under the seat of the bike. Moreover, the government expressly relied on Officer Paige's and Ms. Evans's testimony to rebut Mr. Smith's defense. It explicitly argued to the jury that the low success rate of gathering useful prints and uselessness of the recovered print in Mr. Smith's case should cure any reasonable doubt the lack of physical evidence may have created in the jurors' minds. But the jurors, whose function it "is to independently consider the evidence and attach a relative weight to each item of evidence," *Wheeler v. United States,* 930 A.2d 232, 243 (D.C.2007), did not have the benefit of testimonial evidence from Mr. Smith's fingerprint expert. In declaring that Mr. Wynn's testimony was irrelevant because the fingerprint lifted by Ms. Paige was useless, the trial court apparently inadvertently missed the essence of defense counsel's argument about the superiority of the Superglue method in lifting latent

fingerprints, the inadequacy of MPD's investigation, and the relationship of the lack of that evidence to a juror's reasonable doubt.

Furthermore, a review of the record calls into question the trial court's exclusion of Mr. Wynn's testimony on the ground that Mr. Smith was able to establish his theory of defense through cross-examination and on the ground that there was nothing in Mr. Wynn's testimony that would add to his case or aid the jury in determining the issues in dispute. The record reveals that Mr. Wynn's proffered testimony was not elicited during Officer Paige's or Ms. Evan's cross-examination. Nor did Officer Paige ever fully explain the Superglue method or its significance. Without an explanation of the Superglue method and its rate of success in retrieving fingerprints, as Mr. Wynn was prepared to explain, the significance of Officer Paige's decision to ignore the MPD directive and use the powder method was not brought to the jury's attention. Not only could Mr. Wynn's testimony have undermined the government's argument, it likely would have impacted Officer Paige's and Ms. Evan's credibility as witnesses. And, rather than confuse the jury, Mr. Wynn's testimony would have explained to the jury that there were other methods, superior methods, that MPD could have used to lift latent fingerprints from the gun and the bike in an effort to determine whether to exclude or include Mr. Smith with respect to the gun.

In addition, the government's case against Mr. Smith was not particularly strong or overwhelming. He was charged with CPWL, unlawful possession of ammunition, and unlawful possession of a fire-

---

**11.** When Ms. Paige was assigned on the night of May 2, 2008, to lift fingerprints related to this case, the MPD Special Order specified the Superglue method for lifting latent fingerprints from guns, in cases where a firearm was not found on the defendant's person.

arm. The entirety of the government's evidence linking Mr. Smith to the gun recovered from the bike was Officer Fernandez's testimony that he saw Mr. Smith holding the bike on which he found the gun in a pouch underneath the seat, and that testimony was partially impeached.[12] The other responding officers witnessed Mr. Smith in a group of five or six persons, with at least one other person holding a bike. Neither of those officers saw him holding or even standing near the bike on which the gun was found; they only saw him walking away from the area where the bike was located. Even the trial court noted the weakness of the government's case.[13]

In light of these circumstances, we are constrained to hold that the trial court abused its discretion by excluding the testimony of Mr. Wynn. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979) (discussing abuse of discretion). Under *Dyas,* Mr. Wynn's proffered expert testimony was related to the science of lifting fingerprints from objects, particularly the Superglue method specified in the MPD order, as well as the adequacy of the government's investigation; and Mr. Wynn's proffered testimony also concerned the points and characteristics of latent fingerprints, subjects addressed by government witnesses Paige and Evans. Hence, the proffered testimony not only was clearly relevant, but it also was beyond the ken of the average layperson. In addition, there

was no question about Mr. Wynn's skill, knowledge, and experience given his thirty-five years as a fingerprint expert and his prior testimony in the Superior Court. Furthermore, as we said in *Jackson, supra:*

> [The defendant's] defense was that his wrongful arrest stemmed from the [police] officers' neglect, at least of their duty to gather available fingerprint evidence. The relevance of [the defense expert's] testimony to that defense was heightened once [the government's expert] was allowed to testify that, in the view of police experts, fingerprint analysis was futile in cases such as this. Viewed purely as a question of admissibility, therefore, we think the court erred in denying [the defendant's] request to call [a fingerprint expert] to testify.

*Id.* at 590.

▮ The remaining question is whether the trial court's exclusion of Mr. Wynn's testimony was harmless. We are convinced that the exclusion was not harmless under the non-constitutional *Kotteakos* standard.[14] The government's case against Mr. Smith was not strong or overwhelming, as we have indicated and as the trial court recognized. In addition, Officer Paige's and Ms. Evans's limited expertise with respect to alternative methods of lifting fingerprints prevented Mr. Smith from presenting his evidence through their

**12.** Officer Fernandez first testified that Mr. Smith was sitting on the bike, but on cross-examination he testified that Mr. Smith was holding the bike and standing next to it. He then stated that Mr. Smith was straddling the bike.

**13.** At the close of the government's case, defense counsel moved for judgment of acquittal, alleging that the government's evidence was insufficient to establish Mr. Smith's knowledge of the gun and ammunition in the

pouch on the bike. In denying the motion, the trial court stated: "I would not, necessarily, disagree with you, [defense counsel], as to how strong and compelling that evidence is," but concluded that Smith's intent was a question for the jury to decide.

**14.** For this reason, we see no need to discuss the constitutional harmless error standard. *See Heath v. United States,* No. 08–CF–347, 26 A.3d 266 (D.C. July 21, 2011).

cross-examination. Expert testimony concerning the inadequacy of the government's fingerprint investigation and the availability of another, superior method for lifting fingerprints might well have created a reasonable doubt in the minds of jurors. *See Greer v. United States,* 697 A.2d 1207, 1210 (D.C.1997) ("Reasonable doubt is a doubt arising from the evidence, or from lack of evidence, after consideration of all the evidence"). Consequently, we "cannot say with fair assurance ... that the [trial court's] judgment was not substantially swayed by the error"; indeed, "[w]e think it highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos, supra,* 328 U.S. at 765, 776, 66 S.Ct. 1239; *Jackson, supra,* 768 A.2d at 590.

Accordingly, we are constrained to reverse Mr. Smith's conviction and remand this case for a new trial.

*So ordered.*

SCHWELB, Senior Judge, concurring in the judgment:

I find this case considerably more difficult than my colleagues do, for the argument by the defense for the proposition that the excluded expert testimony was relevant to Smiths' guilt or innocence or to reasonable doubt strikes me as counterintuitive, and the notion that its exclusion constituted prejudicial error is, at least for me, somewhat problematic. Nevertheless, because the prosecution was permitted to introduce expert testimony on an issue which, though remote from actual guilt or innocence, was treated by the government as being of great importance; because the defendant was precluded from attempting to refute this testimony by calling his own expert; because, as we have recognized, expert testimony may sometimes "be given undue deference by jurors," *Smith v. United States,* 389 A.2d 1356, 1359 (D.C.

1978), *cert. denied,* 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978); and because this danger is especially acute when one side calls an expert witness and the other cannot and does not, I am constrained to agree that Smith's convictions must be reversed.

The principal theme of George Wynn's proposed expert testimony for the defense was that the "powder" method utilized by the police to develop any potential fingerprint evidence was inferior to the "Super Glue" method contemplated by the MPD's Special Order and favored by Wynn. Thus, according to the defense, the police investigation was defective, and the police may have failed to uncover relevant evidence. Therefore, defense counsel argue, Wynn's evidence would have generated or supported a reasonable doubt of Smith's guilt.

Wynn could not have testified, however, that if the Super Glue method had been used, this would have made it more likely that Smith would be exonerated, for we do not know, and nor could he, if any print on the pistol or the bicycle (whether or not such a print could have been retrieved and identified by better police work) was that of Smith or of someone else. The trial judge was of the opinion that under these circumstances, "what could have been done, what might have been determined ..." lacked probative value, because there was "no evidence to suggest that whether [the police] used powder or used Super Glue ..., the result would have been different...." The judge added that "actually, I think it's going to confuse the jury."

"It is quintessentially the function of the trial judge to determine whether expert testimony is likely to be helpful to the jury." *Benn v. United States,* 978 A.2d 1257, 1279 (D.C.2009) (citations omitted). "It is well established that a trial judge has broad discretion to admit or exclude expert testimony, and that a decision ei-

ther way should be affirmed unless it is manifestly erroneous." *Oliver v. United States,* 711 A.2d 70, 73 (D.C.1998) (per curiam); *Spencer v. United States,* 688 A.2d 412, 417 (D.C.1997). This deferential standard of review is important, and I have more difficulty than my colleagues apparently do with the notion that the judge's ruling can fairly be characterized as "manifestly erroneous." A reasonable person could, I think, agree with the judge that Wynn's proposed testimony would make it neither more likely nor less likely that Smith had possessed the pistol. For this reason, in my view, the relevance of the proposed evidence, which depends entirely on inferences which can allegedly be drawn from perceived shortcomings in the police investigation, is not at all obvious, especially when there is no evidence that these shortcomings, if that is what they were, are likely to have made any difference to the outcome of the trial.

Moreover, even assuming, *arguendo,* that the proposed testimony did have some attenuated bearing on the question of Smith's guilt or innocence, "[t]he trial judge must balance the probative value of the evidence against the risk of prejudicial impact, *including the risk of jury confusion from a trial within a trial,* and may exclude marginally relevant evidence if it will distract the jury from the issue in this case." *Hager v. United States,* 791 A.2d 911, 914 (D.C.2002) (emphasis added; citation and internal quotation marks omitted). The trial court may therefore take reasonable steps to avoid the injection of "collateral and confusing questions into the proceedings." *Bennett v. United States,* 876 A.2d 623, 635 (D.C.2005), *cert. denied,* 546 U.S. 1123, 126 S.Ct. 1134, 163 L.Ed.2d 914 (2006) (citation and quotation marks omitted). In this case, if Wynn had been permitted to testify, then the prosecution would doubtless have attempted to rebut his testimony, with the potential conse-

quence that the jury's attention might well have been distracted from the question of Smith's innocence or guilt, which Wynn's testimony could not and would not have addressed, to the merits of the competing methods of fingerprint retrieval and identification.

Both before the trial court and on appeal, Smith's attorneys have attempted to make the methodology used by the police the focus of the case. Revealingly, defense counsel argued to the trial judge that "the issue of the case is the investigative work by the police." This was, no doubt, an ingenious tactic, but we should not lose sight of the fact that it was Smith who was on trial, and not the investigative techniques of the police. It surely should not be in every case, to quote Justice (then Judge) Cardozo, that "[t]he criminal is to go free because the constable has blundered." *People v. Defore,* 242 N.Y. 13, 150 N.E. 585, 587 (1926).

Even if the trial judge's exercise of his discretion was unreasonable, it is not as clear to me as it apparently is to the majority that Smith suffered any appreciable prejudice. To be sure, Wynn's testimony would have reinforced the defense contention, with which an impartial juror could reasonably agree, that the police investigation was not as thorough as it should have been, but much of this was established on cross-examination and by the MPD's Special Order. The record provides no reason to believe that the use of the Super Glue method, or a more thorough investigation generally, would have retrieved a hypothetical real culprit's fingerprint (rather than Smith's) and would thus have made acquittal more likely, or that the jurors would have determined that any additional evidence that the Super Glue method might have produced was likely to be exculpatory.

The failure to investigate adequately may in appropriate cases give rise to an inference favorable to the defense, for putting on a weak case, when a strong one could have been presented, is assuredly something that the trier of fact is not required to ignore. *See, e.g., Greer v. United States,* 697 A.2d 1207, 1212 (D.C. 1997). Suppose, for example, that five people had witnessed a shooting. Four of them were members of the clergy and of unimpeachable character. The fifth was a near-sighted drug addict with a long criminal record, which included convictions for perjury. Suppose further that the prosecution did not interview any of the righteous and upstanding citizens, but relied solely on the addict's identification of the defendant. In such a case, the jury could surely infer, from the severely flawed investigation, that reliance on evidence gathered by the police during that investigation was unwarranted, and that there was a reasonable doubt of the defendant's guilt. But use of the powder method rather than Super Glue, if blunder at all, is not a comparably colossal kind of blunder, and there is no basis upon which one can reasonably infer in this case that the kind of investigation favored by Wynn would have made it more likely that any additional evidence would have pointed to Smith's innocence.

Smith describes the case for the prosecution as "thin" and "weak," and the majority implicitly agrees. In my view, it is not quite as simple as that. To begin with, it is "never easy" to assess the closeness of a case from our "sheltered appellate perch." *Ford v. United States,* 616 A.2d 1245, 1250 (D.C.1992) (citations omitted). "Since appellate courts cannot view the demeanor of the witnesses, it is difficult to determine the strength of the case, because the result turns in large part on ... credibility." *Brooks v. United States,* 599 A.2d 1094, 1102 n. 17 (D.C.1991) (cita-

tion and internal quotation marks omitted). The legal sufficiency of the case for the prosecution has not been challenged, and the government presented substantial evidence of Smith's guilt. When the officers arrived at the scene, Smith was the only one of the young men who matched the broadcast description of the suspect. Although there were some inconsistencies in the accounts provided by the officers, there was testimony that Smith straddled or sat on and held the bicycle in question. After the police arrived, Smith dropped or left the bicycle and walked away rapidly, ignoring several police orders to stop. One officer thought that Smith was "about to run," and another described him as "running away." The pouch on the bicycle from which Smith separated himself with such apparent dispatch contained a loaded pistol. If the jurors believed the above-described police testimony—and it is *their* assessment of credibility (including reconciliation of contradictions and inconsistencies) that matters, not ours— then there was ample evidence of Smith's having carried the pistol on his bicycle and of his consciousness of guilt. Although the prosecution was not able to present eye-witness testimony to the effect that the weapon was seen in Smith's possession, circumstantial evidence may often be more persuasive than direct evidence. *See, e.g., Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989).

Nevertheless, the exclusion of Wynn's proposed evidence, after expert testimony on the same subject had been presented and emphasized by the prosecution, created what I must agree was an unfair imbalance. Although Wynn's testimony would not have shown that any fingerprint evidence that could have been retrieved and analyzed by use of the Super Glue method would have been favorable to Smith, the government focused heavily during its

presentation of evidence, and again at closing argument, on the difficulties allegedly encountered in lifting and identifying fingerprints. Because, according to the prosecution and its witnesses, such evidence could be recovered from a handgun only in rare cases, the failure of the government to produce any fingerprint evidence here did not, so the government insisted, appreciably weaken the case for the prosecution.

Had Wynn been permitted to testify, he would have provided expert testimony directly contradicting a contention to which the prosecution attached great importance. Because, as the government points out in its brief, "there is an authoritative quality that surrounds expert opinion," *Smith*, 389 A.2d at 1359, and because expert testimony may "be given undue deference by jurors and . . . could thereby usurp the truth seeking function of the jury," *id.*, it is difficult to have confidence in the verdict when the prosecution has been permitted to adduce expert evidence regarding a point that it regards as extremely important while the defense has been precluded from responding in kind. Accordingly, although my analysis differs somewhat from that of my colleagues, I agree that Smith's convictions must be reversed and that a new trial must be ordered.